## COMMONWEALTH *vs.* FRANK S. GILES.

Suffolk.    October 4, 1965. — January 13, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Perjury.   Pleading, Criminal,* Indictment.   *Massachusetts Crime Commission.   Special Commission.   Law or Fact.*

Review of the legislative history of G. L. c. 268, § 1 [105–108]; separate
review by KIRK & SPIEGEL, JJ.   [116–119]
Under the second clause of the first sentence of G. L. c. 268, § 1, all rele-
vant and wilfully false statements under oath, otherwise than in or
ancillary to judicial or adjudicatory proceedings, constitute perjury
where the oath reasonably should be regarded as legally required in the
particular circumstances [106–107]; KIRK & SPIEGEL, JJ., dissenting.
A witness testifying under oath before the Massachusetts Crime Commis-
sion created by Res. 1962, c. 146, as an investigative body was "required
by law to take an oath" within the second clause of the first sentence of
G. L. c. 268, § 1, and subject to prosecution under that clause for per-
jury committed as set forth in that clause [108]; KIRK & SPIEGEL, JJ.,
dissenting.
Whether testimony allegedly constituting perjury under the second clause
of the first sentence of G. L. c. 268, § 1, was relevant and material is a
question of law.   [110]
In order that testimony before an investigative body created by the Legis-
lature support a charge of perjury under the second clause of the first
sentence of G. L. c. 268, § 1, it must be directly or circumstantially rele-
vant and material to, and within the scope of, the inquiry authorized to
be made by such body, and must have a reasonable tendency to influence
a pertinent determination.   [111]
Allegations in an indictment, that the defendant, at a hearing before the
special commission created by Res. 1962, c. 146, "being required by law
to take an oath . . . and being duly sworn did wilfully swear . . .
falsely in a matter relative to which such oath . . . was required wherein
. . . [a certain] question was asked . . . and to this . . . [he] did wil-
fully and corruptly testify . . . [by a certain answer] . . ., well-know-
ing that his said testimony was false," were adequate to charge perjury
by the defendant under the second clause of the first sentence of G. L.
c. 268, § 1.   [103, 112]
Knowledge by one of the falsity of testimony by him on which a charge of
perjury against him is based need not be shown by direct proof at his
trial but may be inferred by the trier of fact from circumstantial evi-
dence; and on evidence showing discrepancies between the testimony of

the defendant on which the charge was based and what the actual facts were warranted findings that his testimony was false and that he knew it to be so.    [112–113]

INDICTMENT found and returned in the Superior Court on May 8, 1964.

There was a report by *Smith, J.,* following a hearing and findings of guilty by him.

*Samuel Hoar, Jr.,* Special Assistant Attorney General (*Warren K. Kaplan,* Assistant Attorney General, with him), for the Commonwealth.

*Donald J. Cregg* for the defendant.

CUTTER, J.    The defendant was indicted upon two counts alleging perjury before the special commission created by Res. 1962, c. 146 (the Crime Commission).    The first count set out that he "being required by law to take an oath . . . and being duly sworn did willfully swear . . . falsely in a matter relative to which such oath . . . was required wherein the question was asked in substance . . . whether . . . [he] had any connection with the Nessex Engineering Company [Nessex] in the period . . . since it was formed . . . and to this . . . [he] did willfully and corruptly testify . . . in substance . . . that he had no personal or financial connection with Nessex . . . from the date it was formed to the present, well-knowing that his said testimony was false."[1]

A judge, sitting without a jury, found the defendant guilty on both counts.    Execution of sentence was suspended pending a determination of issues of law raised by a report to this court under G. L. c. 278, § 30, on the basis of which the facts are stated.

On February 5, 1964, the defendant voluntarily appeared before the Crime Commission, and was informed

---

[1] The second count was similar, except (1) that the question dealt with was whether the defendant "had ever received any amounts of money from Nessex," and (2) it was alleged that the defendant "did willfully and corruptly testify . . . in substance . . . that he had never received a salary or commission or money from Nessex for any . . . purpose other than a loan, well-knowing that . . . [this] was false."

that the commission had been conducting an investigation of Nessex, Stuart Engineering Associates, and others. "He was asked 'with reference to either the investigation in general or the subject matter of the investigation as pertains to those two corporations and the two individuals if (he) desired to make . . . some statements.' "

"With reference to Nessex . . . he was asked . . . what his connection with that company was 'if any, in the period of time since it was formed to the present.' To this question he answered: 'I have had no personal or financial connection with Nessex . . . from the day it was formed to the present.' " He was also asked whether he had "had any communications or dealings of any nature with Nessex," and he answered, "I have not personally, no, not as an individual, no." In answer to the question, "At any point between the formation of Nessex and the present time, did you receive any amounts of money from Nessex?", he answered that he had "never received a salary or commission or money from Nessex for any other purpose than a loan . . . received from Nessex," about 1956. Evidence relevant to whether these answers were true is summarized in the margin.[2]

---

[2] Nessex was formed in 1954 to design and execute various forms of engineering work. The defendant, from 1946 to 1961, was a member of the House of Representatives. In 1961 he became Commissioner of Public Safety. At some time, he "made contacts with" the supervisor of surveys "of the Department of Public Works in behalf of Nessex." In 1955, he indorsed a Nessex note for $9,000. He hired premises for Nessex and hired from Nessex an office in 1956. He sold property in Methuen to Nessex. His wife had worked for Nessex prior to her marriage and continued to do so. The defendant was "on and off" the payroll of Stuart Engineering Associates after 1958. There were "interchanges of personnel between Stuart and Nessex." Nessex checks were signed by its treasurer, the defendant's brother-in-law. Nessex paid for the defendant's membership in at least one Boston club and gave checks "covering fees and expenses of" the defendant at one club, marked on the club's records in the defendant's name. Sales by a florist, shown on the latter's books as sales to the defendant, were paid for "by Nessex checks." Nessex check book stubs "bear handwriting identified as that of" the defendant. Luggage purchased by a person identified as the defendant was paid for by a Nessex check. The stub was in the defendant's hand. A Nessex check paid for airplane tickets to Florida for the defendant and his wife. Other checks were made out to the defendant's church "for its building fund" and "to a college in which his son was a student." The defendant was listed as an employee of Nessex in an insurance program.

The trial judge's report presents in unduly general terms "questions of law" concerning G. L. c. 268, § 1.[3] Greater specification of the issues would have been appropriate. We consider the issues, however, as if the trial judge had stated them as follows:

1. Could the indictment properly be brought under the second clause of the first sentence of c. 268, § 1 (see fn. 3, the words following the letter [C] hereinafter referred to as "the second clause"), which must be distinguished from the first part of that sentence (hereinafter referred to as the "first clause")? 2. Was the indictment defective? 3. Was direct proof of the defendant's knowledge of the falsity of his statements and of his intentional false testimony required, or could his knowledge and intention be inferred from other facts in evidence? To deal with the first and second issues requires consideration of what must be alleged and proved under the second clause.

1. The defendant contends that the indictment should have been under the first clause (see fn. 3, language following points [A] and [B]). Both counts were stated in substantially the words of the second clause (see fn. 3, at points [C] and [D]).

The first sentence of c. 268, § 1, has been in essentially its present form since 1902. See R. L. c. 210, § 1 (1902). The Report of the Commissioners for Consolidating and Arranging the Public Statutes (see p. xviii, and pp. 1759, 1766) combined in one section two separate sections of the Public Statutes (1882), viz. c. 205, § 1 (as amended by

---

[3] Section 1 reads as follows, "Whoever, being lawfully required to depose the truth [A] in a judicial proceeding or [B] in a proceeding in a course of justice, wilfully swears . . . falsely in a matter material to the issue or point in question, or [C] whoever, being required by law to take an oath . . . wilfully swears . . . falsely [D] in a matter relative to which such oath . . . is required, shall be guilty of perjury. [E] Whoever commits perjury on the trial of an indictment for a capital crime shall be punished by imprisonment in the state prison for life or for any term of years, and [F] whoever commits perjury [G] in any other case shall be punished by imprisonment in the state prison for not more than twenty years or by a fine . . . or by imprisonment in jail . . . or by both such fine and imprisonment . . . ." The letters in brackets found in § 1, as quoted above, have been inserted only for convenience in referring to the language immediately following such letters respectively.

St. 1892, c. 123), and § 2.[4]   These sections in the 1882 revision were in substantially the same form as in Rev. Sts. c. 128, §§ 1, 2 (1836), which are set out in the margin.[5] See also Gen. Sts. c. 163, §§ 1, 2 (1860).   Section 1 of the 1836 revision was based on St. 1812, c. 144, § 1.[6]   Section 2 arose from St. 1829, c. 56.[7]   The Commissioners appointed to revise the General Statutes, see their 1835 report, Part IV, p. 23, proposed (1) to put the earlier statutes in two adjacent sections and that what became Rev. Sts. c. 128, § 2 (see fn. 5), should read, "If any person, of whom an oath . . . shall be required, *by the provisions of any act of incorporation, or* by *any general* law *of this Commonwealth,* shall wilfully swear . . . falsely, in regard to any matter . . . respecting which such oath . . . is required, such person shall be deemed guilty of perjury . . ." (emphasis supplied).   The italicized words were omitted before the revision was enacted (see fn. 5).[8]   We regard the

---

[4] The Commissioners said of § 1, at p. 1766 of their report, "Pub. Sts. c. 205, § 1 seems to be objectionable in its present form, for it is doubtful whether by it the legislature intended merely to prescribe the penalty for the common law crime of perjury or both to define the crime and to prescribe the penalty.   If the former, the clause 'being lawfully required to depose the truth in any proceeding in a course of justice' is superfluous.   If the latter, the definition is defective inasmuch as it does not contain all the essential elements of the crime.   The section has been so drafted as to fully define the crime and prescribe the penalty.   See *Jones* v. *Daniels*, 15 Gray, 438; *Avery* v. *Ward*, 150 Mass. 160."

[5] Chapter 128, § 1, reads, "Every person who, being lawfully required to depose the truth in any proceeding in a course of justice, shall commit perjury, shall be punished . . . ."   Then follows a statement of penalties.   Section 2 reads, "If any person, of whom an oath shall be required by law, shall wilfully swear falsely, in regard to any matter or thing, respecting which such oath is required, such person shall be deemed guilty of perjury."

[6] Chapter 144, § 1, provided that "if any person being lawfully required to depose the truth in any proceeding in a course of justice, shall commit any manner of wilful perjury, every person so offending . . . shall be punished . . . ."   The penalties were then listed.

[7] Chapter 56 provided "[t]hat if any person, of whom an oath is required by the provisions of . . . acts . . . [of] incorporation, or by any general law . . . shall wilfully and falsely swear . . . in regard to any matter or thing respecting which such oath is required to be made, such person shall be deemed guilty of Perjury, and on conviction thereof . . . shall be punished in the same manner as perjury is now punished . . . ."

[8] See Journals of the Committees on the Revised Statutes, p. 360 (July 23, 1835), and Amendments to the Report of the Commissioners Appointed to Revise the General Statutes Adopted by the Committees on the Revised Statutes, Part IV, p. 156.

very substantial broadening of the language of the Commissioners' draft of § 2 as showing the legislative intention that all wilfully false (and relevant) statements under oath, otherwise than in or ancillary to judicial or adjudicatory proceedings,[9] were to constitute perjury, where the oath reasonably should be regarded as "required by law." We find substantial support for this view in the discussion of Pub. Sts. c. 205, § 2, in *Avery* v. *Ward,* 150 Mass. 160, 162–163, dealing with an oath concerning a statement of a loss under a fire insurance policy.[10]

The first sentence of G. L. c. 268, § 1 (fn. 3), thus is the outgrowth of two separate lines of statutory development, viz. (a) sections defining common law perjury in court, in adjudicatory proceedings (see *Jones* v. *Daniels,* 15 Gray, 438, 439–440, dealing with testimony before fence-viewers; *Commonwealth* v. *Bessette,* 345 Mass. 358, a contested proceeding under the civil service statutes), and in proceedings ancillary to judicial proceedings, and (b) sections dealing with false statements under oath where there was statutory or other legal justification for requiring an oath in par-

---

[9] Examples of earlier statutes requiring oaths otherwise than in or in connection with judicial proceedings were St. 1818, c. 114, § 3; St. 1828, c. 96, § 27, and c. 97, § 4; St. 1829, c. 53, § 6. See St. 1802, c. 136, § 4, later in Rev. Sts. c. 126, § 38.

[10] Mr. Justice Knowlton said that the interpretation of the words "required by law," was "by no means free from difficulty. It has been said that the provision 'might seem from its very general language to embrace all cases where an oath had been lawfully administered in the execution of official duty.' *Jones* v. *Daniels,* 15 Gray, 438. But in the same case it is suggested that . . . the original statute . . . (St. 1829, c. 56) seems to have had reference to oaths required by special provisions of statute. Both of these remarks were entirely outside of the question involved in . . . [that] case . . . and we are not aware that the statute has ever been before the court for construction. The fact that in so general a revision of our laws as that of 1835 the language was considerably changed, and the further fact that the law has been twice re-enacted in substantially the form in which it was put in that revision, make the original statute of less importance than might otherwise be attached to it." Mr. Justice Knowlton also said that, in the *Avery* case, the oath, "[a]lthough not taken 'in any proceeding in a course of justice,' so that if false it would have subjected the affiant to punishment for perjury at the common law, or under . . . [Pub. Sts. c. 205, § 1], . . . was within the reason of the [common law] rule . . . [because] taken in a preliminary proceeding . . . [to] proceedings in court . . . . [T]he . . . purpose of the statute will best be conserved by so construing it that the requirement in the present case shall be deemed to have been a requirement 'by law,' such that it would have subjected the assured to punishment for perjury if he had wilfully sworn falsely."

ticular circumstances. The language of the second clause
(fn. 3, at points [C] and [D]), like that of its predecessors
(see e.g. fn. 5), is sufficiently broad to include perjury in
hearings before legislative and investigative bodies. See
G. L. c. 3, § 27 (authorizing members of a General Court
committee to "administer oaths to persons examined be-
fore such committee"), and § 28.

The Crime Commission (Res. 1962, c. 146) was "author-
ized to investigate, find facts . . . and file reports which
may be used as a basis for legislative action. It . . .
[lacked] power to apply the law or to prescribe punish-
ment." *Commonwealth* v. *Benoit,* 347 Mass. 1, 6. *Sheri-*
*dan* v. *Gardner,* 347 Mass. 8, 12–13, app. dism. 379 U. S.
647. *Gardner* v. *Massachusetts Turnpike Authy.* 347 Mass.
552, 558–559. See *Gardner* v. *Massachusetts Turnpike*
*Authy.* 348 Mass. 532. By Res. 1962, c. 146, it might "re-
quire . . . testimony under oath," and apply for court or-
ders compelling "the giving of testimony under oath . . .
in furtherance of any investigation under . . . [the] re-
solve." Proceedings before the commission were not "in
a judicial proceeding" and also were not "in a proceeding
in a course of justice" within the meaning of the first clause
(fn. 3, at points [A] and [B]). As has been indicated
above, *Avery* v. *Ward,* 150 Mass. 160, 163 (fn. 10), asserted
that the insurance claim oath there considered was not in a
"proceeding in a course of justice," thus in effect recog-
nizing that this term dealt only with adjudicatory proceed-
ings comparable to those discussed in *Jones* v. *Daniels,*
15 Gray, 438. The Crime Commission's hearings were in-
vestigative and not adjudicatory. Thus perjury in the
course of them could properly be reached only under the
second clause. We hold that when the defendant was ex-
amined before the commission under oath, he was then "re-
quired by law to take an oath" and could be prosecuted
under the inclusive language of the second clause (see fn. 3
at point [C]).

We reach this conclusion because of the breadth of the
statutory language. The ordinary meaning of that lan-

guage would put any person on notice that his conduct will be criminal if he wilfully lies under oath before a body such as the Crime Commission. That such language was made broad intentionally is abundantly confirmed by the 1835–1836 revision of the earlier provisions of St. 1829, c. 56. The second clause (fn. 3 at points [C] and [D]) cannot properly be construed as meaning only what the 1829 statute said, but must be given the interpretation which naturally follows from its words as broadened in 1836. Although the second clause is broad enough to include offences covered by the first clause, in view of the 1902 combination of the two clauses in a single sentence, we construe the second clause as dealing with perjury not covered by the first clause. None of the later revisions of component parts of what is now G. L. c. 268, § 1, leads us to any different conclusion.[11]

The defendant relies considerably upon *Commonwealth v. Louis Constr. Co. Inc.* 343 Mass. 600, 606–607, where one Recine was indicted (as the original papers show) for allegedly false testimony "in a proceeding in the course of justice before a special [investigating] committee of the Senate." The indictment obviously was under the first clause (see fn. 3 at point [B]). This court reversed a conviction and held that it did not appear how the one false answer "was material to any matter . . . under investigation," and went on to say that "[m]ateriality must not only be alleged but proved by the Commonwealth." Recine argued in that case, not only (1) that the materiality of evi-

---

[11] Little, if any, weight can be given to statutes passed long after the 1835 revision. The implication, however, of G. L. c. 3, § 28 (originally St. 1878, c. 51, § 1), is that false testimony before a legislative committee constitutes perjury. A contrary implication could be found, of course, in express statutory provisions, also enacted long after 1835, that false testimony before a particular investigatory body shall constitute perjury. See St. 1908, c. 562, § 5, as affected by St. 1909, c. 486, § 21 (Boston Finance Commission); St. 1912, c. 719, § 9 (Commission on Economy and Efficiency), as affected by St. 1916, c. 296, § 1, and St. 1917, c. 165, § 2. Such provisions may have been included in particular statutes from an excess of caution. When the 1917 statute was revised to appear as G. L. c. 7, § 11, the express provision concerning perjury was omitted, possibly in reliance on G. L. c. 268, § 1. No substantive change seems to have been intended. See Preliminary Report of the Commissioners to Consolidate the Laws (1918) (Res. 1916, c. 43), pp. 70–71.

dence sought had not been shown, but also (2) that the hearing was not a "judicial proceeding" or a "proceeding in the course of justice," or one in which an oath was "required by law." This court did not discuss the second contention. The legislative history of G. L. c. 268, § 1, reviewed above, did not come to our attention. We do not regard the case as determining whether the indictment of Recine under the first clause was proper.

2. The second clause (see fn. 3, at points [C] and [D]) requires, in language different from that used in the first clause (fn. 3, at point [B]), proof of facts showing that a false answer is material. Under the second clause, a false answer, to constitute perjury, must be "in a matter relative to which such oath . . . is required." This language implies that relevance to the subject matter of the inquiry is an element of the offence. Whether questions, allegedly falsely answered, were relevant and material is a question of law. *Sinclair* v. *United States,* 279 U. S. 263, 298–299. *Russell* v. *United States,* 369 U. S. 749, 755–756.

Materiality in respect of perjury means relevance in the sense that the answer might tend in reasonable degree to affect some aspect or result of the inquiry. This court, in discussing an indictment for perjury in a judicial proceeding, said that a wilfully false answer "if it be of no importance and immaterial . . . is not perjury, because it does not affect the issue," although "[i]t is enough if . . . [the answer is] circumstantially material, though not in itself sufficient to establish the issue." *Commonwealth* v. *Pollard,* 12 Met. 225, 228–230. See *Commonwealth* v. *Grant,* 116 Mass. 17, 20–21. See also *Carroll* v. *United States,* 16 F. 2d 951, 953–954 (2d Cir.), cert. den. 273 U. S. 763; *Dolan* v. *United States,* 218 F. 2d 454, 458 (8th Cir.), cert. den. 349 U. S. 923; *United States* v. *Collins,* 272 F. 2d 650, 653 (2d Cir.); *LaRocca* v. *United States,* 337 F. 2d 39, 43 (8th Cir.); *United States* v. *Marchisio,* 344 F. 2d 653, 665 (2d Cir.); Am. Law Inst., Model Penal Code (Tent. draft No. 6, May 6, 1957) § 208.20, and comments, pp. 104–115; Perkins, Criminal Law, 390–392. The language just

Commonwealth *v.* Giles.

quoted is generally applicable to false answers in the course of legislative inquiries (*United States* v. *Lattimore,* 215 F. 2d 847, 851–852 [Ct. App. D. C.]), although what is material and relevant to a legislative inquiry (like that of the Crime Commission) frequently will cover a much wider range than what is pertinent to strictly defined issues in many, if not most, judicial and other adjudicatory proceedings. See *Attorney Gen.* v. *Brissenden,* 271 Mass. 172, 184–185. We hold that, in a prosecution under the second clause (see fn. 3 at points [C] and [D]), in respect of testimony before a legislative body, the Commonwealth must prove facts from which it can be determined that any allegedly false answer was directly or circumstantially relevant and material to the authorized legislative inquiry and within the scope of that inquiry.[12]

The cases cited also indicate that the test of relevancy and materiality is not whether the false testimony did in fact influence a pertinent determination. Instead, it must be decided whether, viewed objectively, the testimony directly or circumstantially had a reasonable and natural tendency to do so. See *LaRocca* v. *United States,* 337 F. 2d 39, 43 (8th Cir.); *United States* v. *Marchisio,* 344 F. 2d 653, 665 (2d Cir.). See also *United States* v. *Hirsch,* 136 F. 2d 976, 977 (2d Cir.), cert. den. 320 U. S. 759. Cf. *United States* v. *Icardi,* 140 F. Supp. 383, 388–389 (D. D. C.); *United States* v. *Cross,* 170 F. Supp. 303, 309–310 (D. D. C.). Upon the evidence summarized in the report (see fn. 2) if it was not controlled by other evidence, the trial judge should properly have ruled (and we assume that he did so rule) that inquiry, concerning the relations of a State rep-

---

[12] We thus reject the Commonwealth's contention (see note to 1859 edition of *Commonwealth* v. *Knight,* 12 Mass. 273, 277) that the crime defined by the second clause of the first sentence of c. 268, § 1, although described in the statute and its predecessors (fns. 3 and 5) as perjury, is essentially a lesser offence (not requiring proof of facts showing relevance or materiality) similar to the offence, essentially false swearing, discussed in *Plummer* v. *State,* 90 Ga. App. 773, 776–780; *Commonwealth* v. *Hinkle,* 177 Ky. 22, 23–24; *State* v. *Ellenstein,* 121 N. J. L. 304, 324; *State* v. *King,* 165 Ore. 26, 30–31. See *United States* v. *Silver,* 235 F. 2d 375, 377–378 (2d Cir.), cert. den. 352 U. S. 880; *United States* v. *Marchisio,* 344 F. 2d 653, 666 (2d Cir.). Cf. *People* v. *Clemente,* 285 App. Div. (N. Y.) 258, 260–261, affd. 309 N. Y. 890.

resentative (who later served as Commissioner of Public Safety) to a corporation for which he approached at least one State employee, was material to the Crime Commission's duty to investigate "the existence and extent of . . . corrupt practices in government." Res. 1962, c. 146.

3.  Because the indictment under the second clause of the first sentence of c. 268, § 1, was expressed in substantially the statutory language, it adequately alleged all the elements of the offence there defined. *Commonwealth* v. *Pentz,* 247 Mass. 500, 505. *Commonwealth* v. *Bracy,* 313 Mass. 121, 123. See *Commonwealth* v. *Bessette,* 345 Mass. 358, 360. See also *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 747. As Judge Frank (concurring) said in *United States* v. *Silver,* 235 F. 2d 375, 378 (2d Cir.), "[I]f the statute, without mentioning materiality, implies that element, then so does the indictment; the shorthand expression sufficient in the one is equally sufficient in the other." Any suggestion to the contrary in *Russell* v. *United States,* 369 U. S. 749, 759–769, does not represent the Massachusetts law concerning criminal pleading, and, in any event, may rest upon the difference between (a) a prosecution for perjury during a legislative inquiry and (b) one for contempt for refusal to answer questions in such an investigation. See *People* v. *Matula,* 52 Cal. 2d 591, 598–600.

As to the testimony alleged to be false, the indictments were sufficiently specific. They could have been amplified, in the discretion of the trial judge, by a bill of particulars, if one had been requested. See G. L. c. 277, § 40.

4.  The defendant incorrectly contends that there must be direct proof that he knew that his testimony was false. Knowledge may be inferred by the trier of the fact from circumstantial evidence, which reasonably tends to show that knowledge existed. *Commonwealth* v. *Holiday,* 349 Mass. 126, 128. In perjury cases, such knowledge may be inferred from the falsity of the statement itself, at least if considered in relation to the facts relating to the defendant's opportunity to have knowledge. *Young* v. *United States,* 212 F. 2d 236, 241 (Ct. App. D. C.), cert. den.

347 U. S. 1015. *United States* v. *Magin,* 280 F. 2d 74, 77–78 (7th Cir.), cert. den. 364 U. S. 914. *United States* v. *Nicoletti,* 310 F. 2d 359, 361–364 (7th Cir.), cert. den. 372 U. S. 942. *People* v. *Dixon,* 99 Cal. App. 2d 94, 96–97. *Pendleton* v. *State,* 239 Ind. 341, 349. *State* v. *Chamberlin,* 30 Vt. 559, 571. See Perkins, Criminal Law, 682; *Katz* v. *United States,* 281 Fed. 129, 130–131 (6th Cir.). We assume that, in any perjury case, if the trier of the fact should conclude that a defendant believed his statements to be true, wilful perjury by him would not have been shown. See *Commonwealth* v. *Pollard,* 12 Met. 225, 227–228; *Commonwealth* v. *Brady,* 5 Gray, 78, 79.

The report shows that there was direct evidence concerning (1) the defendant's testimony before the commission and (2) what the facts were (fn. 2). The discrepancies between the defendant's testimony and the evidence stated in the report warranted the trial judge in concluding that the testimony was false. From this evidence, also, the trial judge could reasonably infer that the defendant knew that his testimony was not true.[13]

5. The issues treated as raised by the report are answered: (1) The indictment was properly brought under the second clause of the first sentence of G. L. c. 268, § 1. (2) The indictment was proper in form. (3) Knowledge by the defendant that his statements were false could be inferred from other facts shown in evidence.

*So ordered.*

KIRK, J. (dissenting)   Mr. Justice Spiegel and I do not agree with the opinion.

We do not condone falsehood before the Crime Commission or elsewhere. That, however, is not the issue before us.

---

[13] We do not regard the report (which merely summarizes what may be only a part of the evidence) as presenting questions, argued by the defendant, concerning (1) the adequacy of the proof of falsity, and (2) whether older rules as to such proof still remain in effect. See *Commonwealth* v. *Fine,* 321 Mass. 299, 302–303, and cases cited; *United States* v. *Marchisio,* 344 F. 2d 653, 664–665 (2d Cir.); Wigmore, Evidence (3d ed.) §§ 2040–2042.

Our primary concern here is the law established by the majority and its effect upon the fundamental rights of the citizens of the Commonwealth. We are deeply disturbed by the construction given to G. L. c. 268, § 1. We base our dissent particularly on the meaning attributed to the second clause of the first sentence of § 1 (hereafter referred to as "the second clause"). With respect to the second clause, the majority reach the general conclusion that "*all wilfully false* (and relevant) *statements under oath,* otherwise than in or ancillary to judicial or adjudicatory proceedings . . . *constitute perjury, where the oath reasonably should be regarded as 'required by law' "* (emphasis supplied). They also say that the second clause, as distinguished from the first clause, deals with "false statements under oath where there was statutory or *other legal justification for requiring an oath in particular circumstances*" (emphasis supplied). We regard the judicial infusion of these vague and imprecise words into a criminal statute as a strange precedent indeed. We feel it is our duty to set out the reasons for our disagreement.

Our objection to the majority's construction of the second clause is fourfold: First, that it miscarries the legislative intent; second, that it is contradictory to the history of the statute; third, that it raises grave constitutional problems; fourth that it constitutes, immediately and prospectively, a judicial declaration of crimes. Incidental to the discussion of these points we shall indicate that the second clause, as we read it, is clearly constitutional, carries out the legislative intent, and does not involve, now or later, judicial intrusion into the legislative domain.

1. Under the majority's construction, the second clause becomes a catchall "definition" of the crime of perjury. It reduces the first clause to the status of a mere specific application of the catchall "definition," and, in effect, renders the first clause superfluous. Surely, one who is "lawfully required to depose the truth in a judicial proceeding or in a proceeding in a course of justice [and who] wilfully swears . . . falsely in a matter material to the issue or point in

question" falls clearly within the majority's definition of one who makes "wilfully false (and relevant) statements under oath . . . where the oath reasonably should be regarded as 'required by law' "; and also falls clearly within the majority's alternate definition of one who makes "false statements under oath where there was . . . legal justification for requiring an oath in the particular circumstances." The majority, having thus declared the catchall significance of the second clause and having acknowledged that, under our decisions, the first clause is inapplicable to the case before us, make the abrupt and unwarranted conclusion: "Thus perjury in the course of . . . [the Crime Commission's hearings] could properly be reached only under the second clause." We venture the comment that this conclusive statement does not answer the question before the court. This statement assumes that a false statement made by a person who has been placed under oath by the Crime Commission is perjury. That which the statement assumes to be the law is the very question of law we are called upon to decide. It also overlooks the fact that had the Legislature intended that false testimony before the Crime Commission should constitute perjury or be punishable as perjury it could have so provided expressly in the resolve creating the commission.

In comparable situations, the Legislature has done so in the past. The references in footnote 11 of the majority opinion are examples of the clear expression of the legislative will. Unlike the majority, however, we do not think that when the Legislature expressly has provided that false testimony before a particular investigatory agency shall constitute perjury, the provision can properly be treated as surplusage, and be explained away on the ground that it "may have been . . . from an excess of caution" by the Legislature. Nor do we think that where such an express provision has been pointedly omitted by a succeeding Legislature, the omission can be explained away as "possibly in reliance on G. L. c. 268, § 1." We reject the idea that felony statutes may be construed against the citizen be-

cause of a "may have been" or a "possibly." We feel it is our duty to point out that one of the results of the majority's reasoning is that, in any one of the several hearings which may be held under G. L. c. 7, § 11, any citizen who is summoned as a witness and who testifies falsely is subject to punishment as a perjurer. And this is so, according to the majority, even though there is nothing in G. L. c. 7, § 11, so providing; and it is so, according to the majority, despite the further fact that the Legislature, when it incorporated St. 1912, c. 719, § 9, as affected by St. 1916, c. 296, § 1, and St. 1917, c. 165, § 2, into the General Laws, pointedly omitted the provision for perjury.

We do not think for a moment that the Legislature ever intended that the second clause should have the all-inclusive sweep imputed to it by the majority. We submit also that the majority's construction is repugnant to and in contradiction of the statutory history, which we now consider.

2. The majority note, and we agree, that the statute of origin of the second clause was St. 1829, c. 56. We quote in full the latter statute: "Be *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That if any person, of whom an oath is required by the provisions of the acts incorporating any Bank, Manufactory, or other incorporation, or by any general law of this Commonwealth, shall wilfully and falsely swear or affirm in regard to any matter or thing respecting which such oath is required to be made, such person shall be deemed guilty of Perjury, and on conviction thereof before the Supreme Judicial Court, or before the Municipal Court of the City of Boston, if said offence be committed within the County of Suffolk, shall be punished in the same manner as perjury is now punished by the act to which this is in addition." The majority opinion does not, however, cite the title to St. 1829, c. 56, which reads: "An Act *in addition to* 'An Act against perjury and subornation of perjury' " (emphasis supplied). The act, to which St. 1829, c. 56, was an addition, was St. 1812, c. 144, § 1, relating to common law perjury, i.e., falsely deposing in

a proceeding in a course of justice. Statute 1812, c. 144, § 1, bore the title which is quoted in the title of St. 1829, c. 56. Nor does the majority opinion refer to the final words of St. 1829, c. 56, which read: "shall be punished in the same manner as perjury is now punished by the *act to which this is an addition*" (emphasis supplied). These words, which we have emphasized, indicate to us that the original predecessor of the second clause was specifically supplemental to, and not inclusive of, the statute to which it was an addition. And we maintain that nothing has happened in the meantime, legislatively or judicially, to alter the significance of and the relationship between the two statutory provisions.

We resume the history. By Rev. Sts. c. 128, §§ 1, 2 (1836), the two provisions (St. 1812, c. 144, § 1, and St. 1829, c. 56) were brought together for the first time. Considering the statute in that precise form, the court, speaking through Justice Charles A. Dewey[1] in *Jones* v. *Daniels*, 15 Gray, 438, 439 (1860), said: "By § 2, 'if any person, of whom an oath shall be required by law, shall wilfully swear falsely in regard to any matter or thing respecting which such oath is required,' such person shall be deemed guilty of perjury. This latter provision, as found in the second section, might seem from its very general language to embrace all cases where an oath had been lawfully administered in the execution of official duty. *But from a reference to the original act from which this provision was transferred to the Rev. Sts. we are inclined to the opinion that the section had reference to official oaths, as oaths required of directors of banks or other corporations, or individuals of whom by special statute provisions oaths are*

---

[1] Justice Dewey assumed his position on the Supreme Judicial Court in 1837, one year after the revision of the statutes. At the time of his appointment he had been for several years district attorney for the Western District of the Commonwealth, then comprising Hampden, Hampshire, Franklin and Berkshire counties. He served on the court for twenty-nine years (1837–1866), twenty-three of which were with Chief Justice Shaw, who was Chief Justice when *Jones* v. *Daniels* was written. Justice Dewey was senior associate Justice for sixteen years. Remarks at his memorial may be found in 12 Allen, 617. At page 624, Chief Justice Bigelow referred to his command of the criminal law and his "extensive knowledge of the statutes of the Commonwealth."

*required.* St. 1829, c. 56.'' The wording of the statute as it appeared in the 1836 revision and as thus construed has never been changed in any material element despite general revisions of the laws. See Pub. Sts. c. 205, §§ 1, 2 (1882); R. L. c. 210, § 1 (1902); and G. L. (Ter. Ed.) c. 268, § 1. No extensive citation of cases is necessary to stress the significance of this fact where the issue is one of statutory construction. It is enough to recall what the court said, speaking through Justice Metcalf, in *Commonwealth* v. *Hartnett,* 3 Gray, 450, 451: '' [W]hen the same legislature, in a later statute, uses the terms of an earlier one which has received a judicial construction, that construction is to be given to the later statute. And this is manifestly right. For if it were intended to exclude any known construction of a previous statute, the legal presumption is, that its terms would be so changed as to effect that intention.'' The court recently indorsed this principle in *Weiner* v. *Boston,* 342 Mass. 67, 73. Despite this salutary rule and despite the long and consistent legislative history, conjoined with the judicial construction of the second clause in 1860, the majority now reach back to 1836 and point to the same statute as one which ''would put any person on notice that his conduct will be criminal if he wilfully lies under oath before a body such as the Crime Commission'' or before the Boston Finance Commission, or under G. L. c. 7, § 11, before ''any commissioner [who] . . . may require the attendance and testimony of witnesses.''

The majority appear to rely upon a comment made in *Avery* v. *Ward,* 150 Mass. 160, 163 (1889), to the effect that the statement in *Jones* v. *Daniels* was not necessary to the decision. This comment does not, in our judgment, impair the validity of the construction given in *Jones* v. *Daniels* particularly in light of the fact that the statute has remained essentially unchanged for more than a century. Furthermore no different construction was made of the statute in *Avery* v. *Ward.*

The oath involved in *Avery* v. *Ward* was analogous to the examples of those oaths covered by the second clause

given in *Jones* v. *Daniels*. The proof of loss oath[2] in the *Avery* case resembles the "official oaths" mentioned in the *Jones* case in that it was given not as a guaranty of truth in a proceeding at law, but as an affirmation of existing facts given by a citizen for the purpose of securing the reliance of other citizens to the advantage of the oath-taker. Just as a director's oath is intended to secure the reliance of depositors or shareholders on the soundness of the enterprise, so also is the claimant's oath meant to satisfy the insurer in relying on the truth of a claim. On this basis, therefore, the holding in *Avery* v. *Ward* does not conflict with the construction of the second clause given in *Jones* v. *Daniels*. Neither case justifies the long step taken by the majority here in extending the scope of the second clause to sworn testimony, before an investigatory body, which is neither a part of a proceeding in a course of justice nor an element of a reliance-creating arrangement between private citizens.

We take the view that the construction of the statute in *Jones* v. *Daniels* is correct and that it accomplishes what the Legislature intended, namely, that where there is a specific statute or a provision in a general law which requires that a statement regarding a particular matter or thing be made under oath, and the statement is made wilfully and falsely under oath, the affiant shall be punished as a perjurer. We do not think the statute is aimed at an answer made to a question during a continuing or running interrogation by a body whose powers are investigatory and in no sense adjudicatory.

We consider that our position is strengthened by the language of G. L. c. 268, § 1A, which, while retaining the penalty for perjury, permits written statements, "required by law . . . to be verified by oath," to be made under the penalties of perjury. Section 1A, it seems to us, clearly re-

---

[2] In the *Avery* case a statute required that, before an action be commenced under a fire insurance policy, proof of loss must be filed under oath. A wilfully false statement in the proof of loss, made under oath, was held to be perjury within the meaning of the common law, since the oath required by the statute lay "at the foundation of proceedings in court."

fers to the matters covered by the second clause and merely changes the method by which the particular statement may be made without derogating from the penal consequences if the statement is falsely and wilfully made.

3.   We turn now to the constitutional problems which we think are inherent in the construction made by the majority. Their interpretation leaves the crime of perjury in such a state of indefiniteness, vagueness and uncertainty as plainly to run afoul of art. 12 of the Declaration of Rights of the Constitution of the Commonwealth and the due process clause of the Fourteenth Amendment to the Constitution of the United States.   We are perplexed by the words "other legal justification for requiring an oath in particular circumstances" and also by the words "where the oath reasonably should be regarded as 'required by law.'"   If we understand the opinion, the majority say that this court should apply these generalizations as each case arises, as indeed it has in the case before us.   In short, under the construction made by the majority, the inherent vagueness and uncertainty of the second clause may, in a particular case, achieve certainty when this court speaks.   We think that no citizen should be expected to make that perilous prediction.   *Commonwealth* v. *Slome*, 321 Mass. 713, 715. "A 'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'"   *Commonwealth* v. *Carpenter*, 325 Mass. 519, 521, and cases cited.   *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453.   On this point our position is that, as construed by the majority, the statute fails for want of certainty and definiteness.   See *Jones* v. *Robbins*, 8 Gray, 329, 337–350; *Commonwealth* v. *Pentz*, 247 Mass. 500; *Commonwealth* v. *Reilly*, 248 Mass. 1; *Jaquith* v. *Commonwealth*, 331 Mass. 439, 441–442.

4.   Our fourth point is corollary to the third.   No standard is set by the words "other legal justification for requiring an oath in particular circumstances" or by the

words "where the oath reasonably should be regarded as 'required by law.'" These words, engrafted on the statute by the majority, not only leave their meaning and applicability to the judiciary, but they implicitly require the court, as each case arises, to supply an essential element of the crime, namely, the particular oath, whether required by statute or not, to which the penalty for false swearing attaches. Penal statutes should not be left in such a peripatetic state. From the founding of the Commonwealth public policy has been against such enactments. "The public policy of the Commonwealth in the creation of crimes is not for this court to determine, but for the Legislature. Our function is merely that of discovering the meaning of the words that the Legislature has used, bearing in mind that under the American system of law a citizen is not to be punished criminally unless his deed falls plainly within the words of the statutory prohibition, construed naturally. His deed is not to be declared a crime upon ambiguous words or by a strained construction." Lummus, J., in *Commonwealth* v. *Corbett,* 307 Mass. 7, 8, and cases cited.

5. It is our hope that the discussion of the foregoing objections has served to point out that the second clause has a special and limited purpose, that the purpose was stated in *Jones* v. *Daniels,* 15 Gray, 438, that the construction there given makes clear, definite and certain to all citizens the particular acts which are punishable, that the construction is the only logical one, and that it avoids the constitutional pitfalls to which the majority's construction would lead us.

6. We are not content, however, to rest our dissent exclusively on the grounds thus far advanced. Rising above all that we have said is our firm belief that the procedure here followed is alien to the spirit which has characterized the administration of justice in our Commonwealth. To be specific: — The Crime Commission, so called, was established by the Legislature with the approval of the Governor, by Res. 1962, c. 146. Its powers are defined in the resolve and by this court's interpretation of it. *Sheridan* v. *Gardner,* 347 Mass. 8. *Gardner* v. *Callahan,* 347 Mass.

21. *Gardner* v. *Massachusetts Turnpike Authy.* 347 Mass. 552. *Gardner* v. *Massachusetts Turnpike Authy.* 348 Mass. 532. Under these legislative and judicial authorities, the Crime Commission has its limitations as well as its capabilities. It is an investigating agency. Its ultimate mission is to report the results of its investigation to the Legislature with recommendations for legislation. It is not, as is the grand jury, an arm of the court. Its powers are not adjudicatory. Its hearings must be conducted in private. A single member of the commission can conduct its hearings. Witnesses "shall before testifying be sworn." Its records shall be kept secret.

Against this background one who, either under summons or voluntarily, enters the private quarters of the commission may be wholly unaware of the reason which calls for his appearance. He is charged with no crime. In truth, he may have committed no violation of existing law. The investigation may be directed solely to the supposed misdoings of others as to which the witness may be suspected of having knowledge. And yet, under the majority holding, a person who thus appears before the commission (or a single member) whose powers are as defined, and testifies to a fact which, in the judgment of the commission (or a single member), is not the truth, may emerge from the hearing subject to an indictment for the heinous crime of perjury. Such an indictment rests on an utterance made in the presence of the commission (or a single member) during an extended interrogation, even though there had been no allegation or accusation of wrongdoing against the witness prior to his appearance before the commission. This procedure, we feel deeply, is contrary to the very fundamentals of justice as we have believed them to be. It is inquisitorial. It is a procedure which up to this moment has never been tolerated in the Commonwealth. It should not now be countenanced except by authority of the Legislature expressed in clear and unmistakable language. Such authority, we respectfully submit, should not be found, as the majority have found it, in the judicial revelation of

a novel meaning of a substantive criminal statute enacted more than 130 years ago. St. 1829, c. 56. Rev. Sts. c. 128, § 2 (1836). Pub. Sts. c. 205, § 2 (1882). R. L. c. 210, § 1 (1902). G. L. (Ter. Ed.) c. 268, § 1.

We would hold that the indictment was not properly brought and, accordingly, we would reverse the judgment.