COMMONWEALTH *vs.* FRANK S. GILES.

Suffolk.    October 3, 1966. — June 22, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Perjury. Practice, Criminal,* Requests, rulings and instructions, Perjury prosecution, Place of trial. *Massachusetts Crime Commission. Special Commission. Evidence,* Of perjury. *Words,* "Connection," "Money," "Benefits."

At the trial of an indictment for perjury in that the Massachusetts Crime Commission asked the defendant at a hearing whether he had "any connection with" a named corporation and that he falsely answered "that he had no personal or financial connection with" it, subsequent disclosures to the commission by him in his testimony of various "connections" he had had with the corporation must be considered in appraising his original answer. [11–12]

Where it appeared that a public official testifying before the Massachusetts Crime Commission was asked whether he had any "connection with" a certain corporation and answered that he "had no personal or financial connection with" it, that his later disclosures to the commission in his testimony left ambiguous what he meant by "connection," whether he used that word in its ordinary, broad sense or in a limited sense as meaning possession of a "financial or proprietary interest," and how he meant to leave his testimony as a whole, and that clarification of the meaning of his answer was not developed by further questions by the commission, it was held that the answer, when read with the disclosures,

was too ambiguous to permit attributing a definite meaning to it beyond a reasonable doubt, or to support a conviction of the official upon an indictment for perjury in that he knew the answer was false; and a judgment against him for perjury was reversed, the finding of guilty was set aside, and judgment for him was ordered. [15–16] KIRK & SPIEGEL, JJ., concurred in the result.

Evidence at the trial of an indictment for perjury warranted findings that the defendant, while testifying before the Massachusetts Crime Commission, was asked by the commission whether he "had ever received any amounts of money from" a certain corporation and answered that he had "never received a salary or commission or money from" the corporation, that his answer together with his later disclosures to the commission amounted to a statement that he had not received "moneys" either directly or indirectly from the corporation, and that there were payments of its money which went to the defendant or for his benefit and so such statement was false, but doubt created by the judge's granting of the defendant's request for a ruling that on the evidence he "would have perjured himself had he stated that he had received moneys from" the corporation required that a judgment against the defendant be reversed and a finding of guilty be set aside. [17–18] KIRK & SPIEGEL, JJ., thought that judgment for the defendant should have been ordered.

In perjury cases the defendant ordinarily should be furnished in advance of trial a copy of what he himself has said in the testimony alleged to have been false, without the necessity of his showing any "particularized need." [19] KIRK & SPIEGEL, JJ., were of the opinion that the defendant in a perjury case is entitled as of right in advance of trial to a complete transcript of his testimony before the tribunal where the perjury was alleged to have occurred.

In the circumstances, an inquiry by the Massachusetts Crime Commission, created by Res. 1962, c. 146, as an investigative body, of a former member of the General Court, who testified before the commission after requesting an opportunity to explain to the commission his relationship with a certain engineering corporation under commission investigation, as to whether he "had ever received any amounts of money from" the corporation, to which he gave an allegedly false answer, was relevant to the investigation authorized to be made by the commission; the inquiry was not improper merely because the commission might have had in its possession substantial information about the matter and the witness prior to the hearing at which he testified. [19–20] KIRK & SPIEGEL, JJ., dissenting.

The so called "two witness" rule had no applicability at the trial of an indictment for perjury at which a number of witnesses testified about relevant circumstances and there was documentary material bearing upon the truth of what the defendant had said. [20]

There was no prejudice to a defendant, indicted in Suffolk County for perjury there before the Massachusetts Crime Commission, in the denial of a motion to transfer the trial to Essex County, where indictments against the defendant related to the alleged perjury were pending. [20]

INDICTMENT found and returned in the Superior Court on May 8, 1964.

A motion for change of place of trial was denied by *Goldberg, J.*

. The case was heard without jury by *Smith, J.*

*Donald J. Cregg (Frederick W. Murdock, Jr.,* with him) for the defendant.

*Samuel Hoar, Jr.,* Special Assistant Attorney General (*Warren K. Kaplan,* Assistant Attorney General, with him), for the Commonwealth.

CUTTER, J.   A Superior Court judge, sitting without a jury, found the defendant guilty on an indictment in two counts alleging perjury before the Crime Commission (Res. 1962, c. 146).   He imposed a sentence to the House of Correction and a fine on the first count and a concurrent sentence to the House of Correction on the second count.   The case has been before us once before on certain issues of law. *Commonwealth* v. *Giles,* 350 Mass. 102, 113, ("the first *Giles* case").[1]

The complete stenographic transcript of the trial (held under G. L. c. 278, §§ 33A–33G, as amended) is now before us.   Various errors are assigned.

## THE INDICTMENT.

The indictment may be summarized as follows (emphasis supplied).   Count 1 charged that before the commission "the question was asked in substance and effect whether . . . Giles had *any connection with* . . . *Nessex* Engineering Company [Nessex] in the period of time since it was formed to. the present and to this . . . Giles did willfully . . . testify . . . in substance . . . that he had no personal or financial connection with Nessex . . . well-knowing that

---

[1] The report in the first *Giles* case summarized what we recognized (350 Mass. 102, 113, n. 13 might "be only a part of the evidence" and was not treated "as presenting questions . . . concerning . . . the adequacy of the proof of falsity." That report also did not transmit to us the transcript of the commission hearing or reveal (a) what disclosures were made by Giles to the commission, and (b) what additional facts were brought out at the trial (see fns. 4–7, and related text).

his . . . testimony was false." Count 2 charged that the defendant was asked whether he *"had ever received any amounts of money from Nessex* . . . and to this the . . . [defendant] did willfully . . . testify . . . in substance . . . that he had never received a salary or commission or money from Nessex for any other purpose . . . than a loan, well-knowing that his said testimony was false."

### The 1964 Hearing.

On October 11, 1963, the commission's counsel by letter gave the defendant an "opportunity to appear voluntarily at a hearing" concerning Nessex and Stuart Engineering Company (Stuart). Giles, after consulting counsel, did not appear.

Later Giles talked with the Attorney General. As a result, he received a letter dated January 31, 1964, from the Attorney General enclosing a copy of a letter of the same date from the commission's chairman to the Attorney General, which began (emphasis supplied), "You told me yesterday that Commissioner Giles has requested an opportunity to explain to the Crime Commission *his activities* with respect to the survey companies that the Commission has investigated. The Commission will arrange a hearing at which he may appear voluntarily."[2]

On February 5, 1964, the defendant (against the advice of his counsel) appeared voluntarily before the Crime Commission. His counsel accompanied him. He was warned of his constitutional rights, was sworn, and was told that the commission had "been conducting an investigation of . . . Nessex . . . [and] Stuart." He was then given an

---

[2] The chairman's letter said also, "An opportunity to appear voluntarily was given to Mr. Giles by letter from Mr. Philip Cronin, counsel for the Commission, dated October 11, 1963. Mr. Giles acting on advice of his counsel refused to appear unless summoned. The Commission then decided that it would not issue a summons since it was not seeking Mr. Giles' testimony. This position remains unchanged. No summons will be issued for the appearance he has requested."

opportunity to make "some statements" concerning the two corporations.[3]

The following questions were asked and answers given (emphasis supplied). Q. "With reference to Nessex . . . I wonder if you could tell us what your *connection with that company was, if any,* in the period of time since it was formed to the present?" A. "I have had *no personal or financial connection* with Nessex . . . from the day it was formed to the present." Q. "Have you had any communications or dealings of any nature with Nessex . . .?" A. (conference with counsel) "I have not personally, no, not as an individual, no."

At a later stage in the hearing, the defendant was asked (emphasis supplied): Q. "At any point between the formation of Nessex and the present time, *did you receive any amounts of money from Nessex?* A. *I have never received* a salary or commission or *money from Nessex* for any other purpose other than a loan which I have received . . . from Nessex." This answer (p. 33 of commission hearing transcript) should be read with a subsequent answer (p. 65 — emphasis supplied): Q. ". . . is [it] your feeling that at no time did you *indirectly* get any funds from Nessex . . .?" A. "That is absolutely so."[4] The de-

---

[3] In response to this opportunity, Giles said that he had appeared "voluntarily to answer any questions you may have to direct to me." When asked whether he thought any "specific misinformation or misunderstanding . . . should be clarified," he replied that, without knowing the "complete extent of . . . [the commission's] investigation," he was "not in a position to be specific." There was testimony at the trial that, because of extensive inquiries in his town, Giles "became conscious that . . . [he] was being investigated by the . . . Crime Commission early in 1963."

[4] This later line of questioning continued as follows: Q. "Did you feel . . . between 1956 and 1962 that it would be illegal for you to receive compensation from Nessex . . . [because] Nessex was doing work for the [S]tate?" A. "I didn't receive any amount from them. I never had an opportunity to give it thought. (1) I was employed by another business; (2) [i]t was our prime purpose in setting up our own organization to prepare for the future of my son . . . . I had all I could handle at that particular time up until . . . Stuart went into business." Then the defendant was asked, ". . . but apart from the loans . . . the transfer of personnel and the use of equipment, I gathered that you had no other direct contact with Nessex and I wasn't clear from your testimony . . . why . . . Nessex was independent and separated from both you and Stuart?" A. (conference with counsel) "This, of course, had nothing to do with me because my family didn't have any money invested in Nessex. It was not our enterprise. They did help me at various

fendant told the commission that in 1956, he borrowed from Nessex for a short term with interest an amount which had been paid back and that he had made loans to Nessex on similar terms to enable "them to meet their payroll."

Apart from the answers mentioned above, Giles in answer to specific questions by the commission's counsel, made statements disclosing certain relations with Nessex. A summary of the principal points in these statements follows.

"[A]s an individual and as a member of the General Court," the defendant had shared with Nessex an office in Lawrence "where . . . [he] met . . . constituents." The defendant paid rent to Nessex. The then president of Nessex, one MacLeod, had formerly worked for the defendant at a drive-in theatre. He had started selling candy and became manager. MacLeod at some time left Nessex. The defendant left the theatre in 1957, and thereafter, apart from his service with the Commonwealth (as a member of the Legislature from 1947 to 1961 and later as Commissioner of Public Safety), was employed only by Stuart. Before Nessex was incorporated (July, 1954), the defendant talked with persons later connected with Nessex, including MacLeod, about whether the defendant "could be of any value . . . in getting some work from the Commonwealth." Later the defendant investigated this possibility with the Commissioner of Public Works, who referred him to the Supervisor of Surveys. As representative, he discussed the payment of bills owed by the State to Nessex with a man in the Department of Public Works. Nessex once had offices in premises in Methuen which the defendant had sold to Nessex.

Mrs. Giles, for less than a year prior to her marriage in 1956 to the defendant, had worked for Nessex. She continued to do so until 1958. The defendant's son "was

times to secure work for people . . . . [T]hey also refused to put people to work for me at various times . . . . I was closely associated with those involved, but I didn't have a financial interest and I was in no way interested in that particular business, because, as I said before .. . . I had a theatre and concession to run and I had to represent people in the General Court, and I was occupied."

trained first with Nessex'' and worked for Nessex until
''our own office [apparently Stuart] was set up . . . after
he became a graduate engineer.''

The defendant said Stuart was formed because his son
(who became ''qualified to go out on his own'') did not get
on with MacLeod and because Stuart wanted to do work
for ''more specialized people'' than the State at higher
rates than the State would pay. The defendant described
Stuart as ''my family corporation.'' It was formed in 1957
by his son (a registered engineer), the defendant's wife,
and one Stramondo. Since 1957 the defendant had been
''affiliated with that company . . . and . . . on and off the
payroll.'' Stuart, he said, ''performed independent sur-
veys . . . did subcontract work and rented men and equip-
ment to other survey companies . . . and carried on a gen-
eral survey . . . [and] civil engineering business.'' He
never had owned stock in Stuart, and had ''no actual con-
trol over Stuart.''

Stuart first had an office in Lawrence, but later moved its
office to the defendant's house in Methuen. Stuart never
performed any work for any State agency (but the defend-
ant said that he did not regard Massachusetts Turnpike
Authority as a State agency). Stuart did furnish Nessex,
on a per diem basis, men, transportation, and survey equip-
ment. Employees of Nessex worked for Stuart and vice
versa. These services were paid for by ''billings between
the two companies every two weeks or every month.'' One
Brennan, who took over the Newton office of Stuart, carried
on surveys of Massachusetts great ponds (see St. 1958,
c. 434, p. 274) and ''we [apparently Stuart] sublet some
men and some equipment to him.'' The defendant on
one occasion ''may have been present and may have . . .
talked'' with ''Nessex and Stuart employees together''
about certain union and health and accident insurance mat-
ters. Nessex was then ''doing sub work for'' Stuart.
''[T]hey were . . . contemplating going into the health
and accident insurance together, and there weren't enough
in one company to go ahead with it.'' The men ''were

being transferred back and forth'' and ''had mutual prob-
lems.'' At the time the defendant testified, one Mahoney,
then president of Nessex, was working for Stuart, and
Nessex had ''some rental equipment and property'' but no
personnel. Giles and his counsel stated that the books and
records of Stuart, then in the possession of Giles' account-
ant, would be made available to the commission.

THE EVIDENCE BEFORE THE TRIAL JUDGE.

At the outset of the trial of the indictment (which lasted
from February 1 through 9, 1965) the Commonwealth in-
troduced the whole stenographic transcript (eighty-eight
pages) of the 1964 hearing before the commission. There
was evidence of those facts about Nessex and Stuart, al-
ready summarized above, which Giles had disclosed to the
commission in 1964 in answer to questions by the commis-
sion's counsel.[5] There also was testimony[6] on matters

---

[5] It was brought out at the trial, however, (1) that Giles was a guarantor
of Nessex's note to a bank (secured by a mortgage on the Methuen property
sold by Giles to Nessex), and (2) that, at least temporarily, he apparently
lent $5,009.45 to Nessex in connection with the sale to it (for an amount indi-
cated by revenue stamps to be $14,000) of land purchased for $10,000 by the
defendant and his wife from the defendant's father's estate. With respect
to the meeting of Nessex and Stuart employees to discuss group insurance
(which Giles had mentioned to the commission), from evidence at the trial, it
could have been found that a life insurance company representative negotiated
with Giles concerning a group policy to cover employees listed in Nessex's
application. Giles was covered as a named insured. Stuart reimbursed Nessex
for a portion of the premiums on this policy. The insurance company would
not knowingly have insured other than a Nessex employee under the Nessex
policy.

[6] There was evidence which would warrant findings as follows: (a) The
defendant's handwriting appears on stubs in each Nessex checkbook from
August 30, 1954, to March 27, 1961. Numerous Nessex checks, except for the
signatures, were written by him. (b) Airline tickets to Florida for the de-
fendant and Mrs. Giles, a $200 gift to the building fund of the defendant's
church, a gift of $250 to the Giles Dinner Committee, the defendant's initia-
tion fee and dues at the Boston Yacht Club, and several hundred dollars worth
of dues and bills charged to the defendant's account at the Boston Club were
paid for by Nessex checks. A Nessex check for $52.50, marked on the stub
''Donation (tickets),'' made out in the defendant's handwriting except for
the signature, was paid to the college attended by the defendant's son. Be-
tween 1956 and 1959, flowers for the Giles family were charged to and paid
for by Nessex at two shops, including flowers for the wedding of the defend-
ant's daughter, also the niece of the defendant's former brother-in-law,
Mahoney, then treasurer of Nessex. In 1959, the defendant purchased ladies'
luggage for Mrs. Giles with a Nessex check signed in blank by its treasurer.
This was carried on Nessex's books as ''field equipment'' and the defendant
wrote the words ''[i]nstrument cases'' on the check stub. (c) An employee

Commonwealth *v.* Giles.

either not disclosed, or much less completely disclosed, before the commission. Certain other items separately were not of as great importance.[7]

An accountant, who had examined the records of Nessex, Stuart, Massachusetts Turnpike Authority, the Metropolitan District Commission, and the Department of Public Works testified (i) that, from January 1, 1958, to June 30, 1962, Nessex received from the Commonwealth and the Turnpike Authority a total of $285,522.59, more than sixty-eight per cent of Nessex's gross receipts for the period,[8] and paid to Stuart (for the use of survey teams furnished by it to Nessex) $126,646.28; and (ii) that from January 1, 1958, to October 31, 1962, Stuart paid the defendant in wages and bonuses $47,625 (bonus total $21,500) and paid Mrs. Giles $17,545 (wages $15,545, bonus $2,000). Nessex paid her $5,300. For a day's work by a four-man survey party Nessex would receive from the State "pretty close to $100." Stuart would charge Nessex for such a party about $90. The daily payroll of Stuart for such a party would be about $65 to $70, exclusive of other expenses incurred by

of Nessex, who had been discharged, was told by the defendant that he had not been discharged by the employee's cousin, who also worked for Nessex. "Nobody else," said the defendant, "does any firing around here but me." An employee hired by Stuart in 1960 was told by the defendant, "I also own Nessex . . . which does the State work." (d) In December, 1956, the defendant turned in a 1955 Buick to a dealer. Nessex was billed in February, 1957, by the dealer for $5,048.20 (with no trade-in allowance) for a 1957 Buick. On April 1, 1957, Nessex paid the dealer $5,048.20 and the dealer paid $3,148.20 to the defendant. This represented $1,850, the appraised value of the 1955 Buick, plus $1,298.20, given because of the sale of the 1957 vehicle, later driven by the defendant.

[7] (a) MacLeod, president of Nessex, first learned in 1955 or 1956, in a conversation with the defendant and Mahoney, that Mahoney, the defendant's former brother-in-law, was to become treasurer of Nessex. Mahoney then acquired from one Beshara about one third of Nessex shares, the rest of which had been owned by MacLeod, one Daniels, and one Manzi. (b) A Mrs. Schlapp sold to Nessex a 1954 Chevrolet station wagon about which she had talked to the defendant. He lent to her, by a Nessex check, $400 to buy generators for her taxi fleet. (c) The defendant negotiated for the rental of premises in Lawrence, occupied by Nessex for about four years.

[8] The evidence indicates that Nessex's aggregate gross receipts from 1958 to 1962, inclusive, were approximately $416,000, and Stuart's approximately $484,000. For their respective fiscal years ending in the years 1958 to 1962, inclusive, the aggregate net profit after taxes and expenses (and after deducting losses in years where there were losses) of Nessex was $5,490.91, and of Stuart was $20,084.89.

Stuart. From this evidence, it could reasonably be concluded (a) that Nessex was charged by Stuart for each four-man survey party a daily amount which gave Nessex on State business only about a $10 margin for other expenses and profit and gave Stuart about a $20 to $25 margin for expenses other than the survey party's payroll and for profit, and (b) that Giles and his wife had received in wages and bonuses from Stuart $65,170 (in addition to the $5,300 received by Mrs. Giles from Nessex) during a period when Nessex had a net income (after taxes and expenses) of only about $5,491 and Stuart (on the same basis) had a net income of only a little over $20,000. The stockholders of Stuart were the defendant's wife (sixty-six shares) and son (thirty-four shares). We assume that the facts concerning Stuart stated above were ascertainable by the commission's accountants from Stuart's records offered at the hearing.

The foregoing figures indicate that Nessex had other business. Doubtless, its officers and its employees (as did Mrs. Giles) received compensation. Stuart (see fn. 8) had a substantial gross income other than that from survey parties furnished to Nessex. Presumably part of the compensation paid by Stuart to Giles and his wife was attributable to that other business. We assume that Stuart had expenses for travel, equipment, insurance, and other operating costs. Nevertheless, the figures just summarized, permitted an inference that a significant part of the receipts from Nessex's large business with the Commonwealth had indirectly gone through Stuart to the defendant and his wife. On the other evidence already mentioned (fns. 6, 7), it could be concluded that the defendant had a close relation with Nessex, had actively participated in various aspects of its business, had exercised influence upon it, and had received the benefits of certain Nessex expenditures.

1. We first discuss the judge's denial (a) of the defendant's motion for a finding of not guilty on each count, and (b) of rulings that the Commonwealth had not proved its case under either count.

## A. THE FIRST COUNT.

(1) After Giles gave his original general answer that he had "no personal or financial connection with Nessex," the character of the hearing (with respect to Giles' "connection" with Nessex) became one in which, for the most part, specific information was sought by more specific questions. The principal issue with respect to count 1 relates to the effect, if any, upon his original answer, to be given to Giles' subsequent disclosure (in answer to specific questions) to the commission of various "connections" with Nessex (see fn. 4, and related text).

The judge ruled that Giles' answers "must be read and construed in light of all the related testimony offered by the defendant . . . [and] of the direction of the particular questions asked . . . by the" commission. That ruling was correct. Despite possible implications of cases like *United States* v. *Norris,* 300 U. S. 564, 576 (see fn. 10, *infra*), in these circumstances it would be unfair to view Giles' original answer in isolation from his later disclosures. See e.g. *Meyers* v. *United States,* 171 F. 2d 800, 805–807 (Ct. App. D. C.), where it was said that a "statement may not be isolated and thereby given a meaning wholly different from the clear significance of the testimony considered as a whole." See also *Fotie* v. *United States,* 137 F. 2d 831, 840–842 (8th Cir.); *Conrad* v. *United States,* 255 F. 2d 247, 248–251 (5th Cir.). Cf. *Van Liew* v. *United States,* 321 F. 2d 674, 677–683 (5th Cir.). Giles' subsequent disclosures were given to the commission as a part of one examination during continuous testimony. His original answer should be appraised, we think, after fair consideration of what he later disclosed.

Consistently with his ruling, it was open to the trial judge to consider the effect (by way of interpretation, explanation, qualification, or retraction) upon Giles' original answer of his subsequent disclosures. The judge was bound to take those disclosures into account (a) in determining what Giles meant by his original answer and in deciding

whether any falsity in it was unintended, and (b) in weighing whether and to what extent Giles meant to correct or modify that original answer.

(2) The words, used in the original answer to the general question referred to in count 1, ordinarily have a broad and inclusive meaning (as Giles in his brief essentially concedes in passages quoted below). Looking at the original question and answer wholly apart from the later disclosures, a majority of the court are of opinion that the trial judge, as trier of the fact, would have been warranted in deciding that Giles intentionally used ''connection'' in its ordinary, broad sense. It was his function to determine, within reasonable limits, what Giles meant by his answers. *United States* v. *Marchisio,* 344 F. 2d 653, 661–662 (2d Cir.), and cases cited. See *Commonwealth* v. *Bessette,* 345 Mass. 358, 360–361.

Nothing in the question or Giles' original answer (that he had no personal or financial ''connection'' with Nessex), viewed by themselves, suggested that ''connection'' was limited to the possession of a financial or proprietary ''interest.''[9] Indeed, almost immediately after the original answer Giles told the commission that he had not personally had ''any communications or dealings of any nature with Nessex,'' thus interpreting in some degree his original answer. Giles was not shown to have had any direct property or ownership in Nessex or its capital stock. There was little direct evidence about the nature of Giles' then current and past relations and contacts with the officers, directors, and stockholders of Nessex (except for MacLeod and for Mahoney, see fn. 6) or about their activities or the extent of their respective investments in Nessex or the necessity of any large investment in a company of this type. Nevertheless, the evidence (see fns. 6, 7, and related text) permitted the judge to conclude that Giles had a very substantial connection with Nessex and participated in and

---

[9] That the judge did not think there was any such limitation of meaning is indicated by his ruling, at Giles' request, that Giles ''would have perjured himself if he had stated that he had a personal or financial *interest* in Nessex'' (emphasis supplied).

influenced its representatives and its affairs to a much greater extent than his commission testimony indicated, and (as already mentioned) that Giles had received a variety of direct and indirect benefits from Nessex.

(3) When Giles' original answer is considered, not by itself, but with his later testimony before the commission, there is apparent a substantial inconsistency between the broad ordinary meaning of "no personal or financial connection" and what Giles did disclose to the commission. These later disclosures by no means covered all Giles' relations with, and actions in behalf of, Nessex which could have been found to have existed on the evidence at the trial. See fns. 6, 7, and related text. Nevertheless, he did disclose a variety of dealings between Nessex and him, both individually and as representing Stuart.

Giles before the commission did not purport to make any express retraction[10] of his original answer, if in fact he intended in that answer (which adopted "connection," the word used by the commission's counsel in his question) to use the term "no personal or financial connection" in a broad sense. The Commonwealth, indeed, does not appear to argue that the later disclosures were an insufficient attempt to retract an original false answer. Accordingly, we proceed to consider whether Giles' later disclosures show that he did not intend by his original answer the usual broad meaning of "no personal or financial connection."

The Commonwealth correctly concedes that the test is "a subjective one" (i.e. what Giles in good faith and in fact did mean, as reasonably "inferred" by the trier of the fact "from all the . . . circumstances, including the commonly accepted meaning of the words used in the question and answer"). The judge correctly gave rulings to the effect that, if Giles believed what he said to be the truth or was

---

[10] See e.g. *United States* v. *Norris,* 300 U. S. 564, 576, reversing a less harsh rule stated in 86 F. 2d 379, 384 (8th Cir.); *United States* v. *Hirsch,* 136 F. 2d 976, 977 (2d Cir.); *State* v. *Phillips,* 175 Kans. 50, 53–54; *State* v. *Kowalczyk,* 3 N. J. 51, 58–59; *People* v. *Ezaugi,* 2 N. Y. 2d 439, 443–444. Cf. *People* v. *Gillette,* 126 App. Div. (N. Y.) 665, 672–674; Am. Law. Inst., Model Penal Code (Tent. draft No. 6, May 6, 1957) § 208.20 (4), (5), pp. 96–97, 115–121, 128–131.

honestly mistaken or if he meant by his answer to the question about his connection with Nessex "that he had no interest in that corporation, as an owner, shareholder, corporate officer, director, employee, or other such interest," he could not be convicted of perjury. The judge also correctly ruled that the defendant could not be convicted unless his answers were "wilfully" and "deliberately and intentionally false." *Commonwealth* v. *Douglass*, 5 Met. 241, 244–245. *Commonwealth* v. *Pollard*, 12 Met. 225, 227–229. See the first *Giles* case, 350 Mass. 102, 112–113; *Seymour* v. *United States*, 77 F. 2d 577, 582–583 (8th Cir.). See also *Commonwealth* v. *Brady*, 5 Gray, 78, 79; *Commonwealth* v. *Sargent*, 129 Mass. 115, 121, 124; *Commonwealth* v. *Bessette*, 345 Mass. 358, 360–361.

As Giles contends in his brief, his commission testimony "is replete with statements . . . [of] what would be considered 'personal connections' within the ordinary meaning of that phrase." From this he argues that "this type of testimony makes it self-evident . . . when he used the word 'personal' he was thinking of that term as something distinct from its normal meaning." Giles at his trial testified that when he went before the commission he "was of the opinion, from all the evidence . . . [he] had . . . that the . . . [c]ommission's intent was to prove that . . . [he] had violated a conflict-of-interest law."[11]  His position is that the circumstances, including the "conflict-of-interest law, and his counsel's advice relative to the meaning of the phrase 'personally interested' " led him to use his words as

[11] Giles argued that prior to the commission hearing he had been told of the provisions of G. L. c. 268, § 10 (prior to its repeal by St. 1962, c. 779, § 3), and "wanted to impress upon the . . . [c]ommission that he had no personal financial interest in Nessex." Section 10, prior to the 1962 statute, read, "A member of the general court . . . who is personally interested, *directly or indirectly*, in a contract made by the general court . . . or by its authority, in which the commonwealth is an interested party . . . or such member . . . who, *directly* or *indirectly*, for himself or for another receives a commission, discount, bonus, present or reward from any person . . . making or performing such contract, shall be punished . . ." (emphasis supplied).

To the inconsistency between the original answer and the later disclosures, the judge in his report to us in the first *Giles* case gave little, if any, consideration. Although that report cannot be regarded as containing the judge's findings, it suggests that the judge did not regard the later disclosures as of much significance.

meaning "financial or proprietary interest." Cf. *Meyers* v. *United States,* 171 F. 2d 800, 804–807 (Ct. App. D. C.), where "connection" was used in addition to the words "financially interested."

The striking inconsistency between the ordinary meaning of Giles' original answer and his later disclosures leaves what Giles did mean by his original answer, or how he meant to leave his testimony as a whole, significantly ambiguous. Certainly, the inconsistency made appropriate further specific questions to Giles before the commission. The absence of any clarification by further questions gives color to Giles' argument, already summarized, that in his original answer he was saying in effect that he had no stock ownership or direct financial interest in Nessex.

Giles' original answer as affected by the later disclosures was permitted to remain ambiguous and confused. Because of that ambiguity it is difficult to say either (a) that Giles intended the answer to have the special meaning for which he now contends, or (b) that it had any other sufficiently definite and certain meaning which would provide an adequate basis for finding it to have been false.

A conviction for perjury must be based upon proof beyond a reasonable doubt of the intentional falsity of an answer susceptible of a reasonably ascertainable meaning. We have come to the conclusion that the original answer, when read with the subsequent disclosures, was too ambiguous (a) to permit the trial judge, beyond a reasonable doubt, to attribute definite meaning to it under the principles of the *Marchisio* case, 344 F. 2d 653, 661–662, or (b) to support a conviction for perjury on count 1. See *United States* v. *Lattimore,* 215 F. 2d 847 (Ct. App. D. C.), *S.C.* 127 F. Supp. 405, 408–411 (D. D.C.), affd. by an evenly divided court, 232 F. 2d 334 (Ct. App. D. C.); *United States* v. *Diogo,* 320 F. 2d 898, 905–907 (2d Cir.). See also *United States* v. *Rose,* 215 F. 2d 617, 622–623 (3d Cir.); *Conrad* v. *United States,* 255 F. 2d 247, 248–252 (5th Cir.); *Blumenfield* v. *United States,* 306 F. 2d 892, 899–902 (8th Cir.).

Giles, a public official who had asked for a chance to ex-

plain circumstances which he knew were under commission investigation, appropriately should not have permitted any such ambiguity in his testimony to arise or continue. Particularly is this so because testimony at the trial (fns. 6, 7), if believed, warranted the conclusion that Giles revealed to the commission less than his whole relationship with Nessex. Giles, however, was not required before the commission by further questions, after the inconsistency and ambiguities already mentioned should have been apparent, to make a more complete disclosure or to explain what he did mean by his original answer. He must be given the benefit of the substantial doubts and confusion which exist as a consequence.

The judgment on the first count is reversed and judgment is to be entered for the defendant on that count.

### B. THE SECOND COUNT.

As with the answer referred to in the first count, Giles' original answer alleged in the second count ("I have never received a salary or commission or money from Nessex for any other purpose . . . than a loan") must be read in the light of his subsequent answers. These include his answer already mentioned given some time later in his testimony (see fn. 4 and related text) agreeing that it was his "feeling that at no time did . . . [he] *indirectly* get any funds from Nessex" (emphasis supplied). That answer tended to indicate what he meant by the original answer.

We recognize, of course, that Giles, in his later disclosures to the commission, in general terms did describe the Nessex-Stuart intercompany payments for work parties and the sale of the Methuen real estate (fn. 5). Also, even if the aggregate amounts and details of the intercompany payments were not set out in the Stuart records (placed by Giles' counsel at the commission's disposal), this information could have been, and later was, ascertained by an audit of Stuart's records. To discover the significance of the Nessex-Stuart payments as a percentage of Nessex's gross receipts from State business, of course, required consultation of the Nessex books. A majority of the court, how-

ever, are of opinion that the later disclosures did not create the same type or degree of ambiguity concerning the meaning of Giles' original answer alleged in the second count as was produced by the later disclosures pertinent to his original answer alleged in the first count.

The evidence warranted the judge in concluding that there were Nessex payments of moneys which, in whole or part, very directly went to Giles or for his benefit, for example, the payment of expenses, club bills, and contributions of Giles or members of his family, fn. 6, Item (b), and the receipt of money for the discount on Nessex's new automobile. See fn. 6, Item (d). Also the evidence concerning the Nessex-Stuart business and financial relationship and the extent to which Giles could be found to have participated in and influenced Nessex's affairs (fns. 6, 7), was relevant to determine the nature and purpose of the intercompany payments. This evidence permitted inferences substantially at variance with the absence of indirect payments or benefits. In the opinion of a majority of the court, on a reasonable interpretation, the question and original answer referred to in the second count (even viewed in the light of Giles' later disclosures to the commission) could be found to amount to a statement that he had not received "moneys" either directly or indirectly from Nessex. That answer could have been found to have been false.

The judge's general finding of guilty on count 2 must, however, be tested by his action on the relevant rulings among those[12] requested by Giles.[13] Requested rulings

---

[12] Giles' unduly large number (seventy-nine) of requests for rulings by the judge had a tendency to become "a device to ensnare him into error." *Stella* v. *Curtis*, 348 Mass. 458, 460–461. He could have directed Giles' counsel to substitute new and fewer requests raising more directly and clearly the issues of law on which Giles wished rulings. See *Commonwealth* v. *Greenberg*, 339 Mass. 557, 584–585. The judge, as an alternative, could have found the subsidiary facts relevant to count 2, and have made only such rulings as were clearly applicable to the facts found by him. See *Donahue* v. *Stephens*, 342 Mass. 89, 92–93.

[13] The judge denied rulings as follows: (no. 15) that the Commonwealth "must show a direct payment of money to . . . Giles to prove that . . . Giles

nos. 13, 15 and 16 (fn. 13), suggest that the judge inter-
preted Giles' answer, referred to in the second count, as
denying that he had been the beneficiary of direct or indi-
rect payments from Nessex. We, however, cannot recon-
cile these with his ruling (giving request no. 33) that on the
evidence Giles "would have perjured himself had he stated
that he had received moneys from Nessex." Giles had not
so testified and there was no occasion for giving the ruling.
Nevertheless, it was given and creates a doubt concerning
the principles applied by the judge. It is possible that the
judge interpreted request no. 33 as referring merely to
direct payments from Nessex to Giles. If that, however,
was his intention the judge did not make this clear. The
ruling leaves us sufficiently uncertain how the judge in-
structed himself on the second count to cause us to reverse
the judgment on that count. A majority of the court, how-
ever, are of opinion that we should not order judgment en-
tered for the defendant on that count.

2. It was ordered (by a judge other than the trial judge)
that Giles be given in advance of trial all his own testimony
before the commission which concerned Nessex, and the
"specific testimony furnished and all questions asked of
. . . [Giles] by the . . . [c]ommission upon which this in-
dictment . . . is based." There is no present occasion to
consider whether the failure to furnish the whole commis-
sion transcript was error, for it was put in evidence on
February 1, 1965, at the beginning of the trial. Giles will
have had it for over two years prior to any new trial on
count 2.

Although our prior authorities did not require this type
of discovery in a criminal case (see *Commonwealth* v. *Ries,*
337 Mass. 565, 583; cf. *Commonwealth* v. *Balliro,* 349 Mass.

received any amounts of money from Nessex''; (no. 13) that ''Giles cannot
be convicted of receiving any amounts of money from Nessex . . . unless the
corporation paid it direct to . . . Giles; and (no. 16) that ''the legal doctrine
termed 'piercing the corporate veil' '' cannot be applied ''to show that moneys
received from . . . [Stuart] and its separate account were moneys received
from Nessex . . . by . . . Giles.'' The judge granted request no. 12, that
the ''question asked'' whether ''Giles had . . . received any amounts of money
from Nessex . . . must be narrowly construed to mean that Nessex . . . must
have turned over its moneys to . . . Giles.''

505, 518), substantial authority supports affording, in advance of trial, to a defendant in a perjury prosecution the complete transcript of his allegedly false testimony. See e.g. *United States* v. *Remington,* 191 F. 2d 246, 250–251 (2d Cir.), cert. den. 343 U. S. 907; *United States* v. *Rose,* 215 F. 2d 617, 628–630 (3d Cir.). See also *Parr* v. *United States,* 265 F. 2d 894, 902–903 (5th Cir.). We think that, in line with such authority, in perjury cases hereafter, the defendant ordinarily should be furnished in advance of trial a copy of what he himself has said in the testimony alleged to have been false, without the necessity of his showing any "particularized need." See *Pittsburgh Plate Glass Co.* v. *United States,* 360 U. S. 395, 400.

3. Although some assignments of error have become immaterial because of our disposition of count 1, certain assignments must be dealt with to avoid questions on a retrial of count 2.

(a) There was evidence (a) that contracts had been awarded by State agencies to Nessex; (b) that Nessex had obtained a very large number of survey teams from Stuart; (c) that the defendant, while a member of the General Court, had helped to obtain contracts for Nessex; and (d) that he had been on Stuart's payroll. Before the commission, Giles did not object to or refuse to answer any question as not relevant to the commission's investigation. In the opinion of a majority of the court, the inquiries made were relevant to the commission's general legislative investigation under Res. 1962, c. 146, in respects discussed in the first *Giles* case, 350 Mass. 102, 111–112. This view is supported by the evidence just summarized, by the possible relevance to the Nessex-Stuart transactions of G. L. c. 268, § 10, prior to its repeal in 1962 (see fn. 11), and by testimony of the commission's counsel concerning a general investigation by him of survey companies.

(b) The inquiry, in the opinion of a majority of the court, was not improper merely because the commission may have had in its possession substantial information about Nessex, Stuart, and Giles prior to the hearing, which (see fn. 2 and

related text) Giles had himself requested.[14]   It was, of course, important that even information not sought by the commission be truthful.   What Giles had to say was likely to be relevant to the commission's legislative investigation of a type of complicated intercompany relationship (a) by which proceeds of public contracts might reach a public officer, and (b) which might appropriately be subjected to statutory regulation.

A majority of the court are also of opinion that, on the present record, *United States* v. *Icardi,* 140 F. Supp. 383, 388–389 (D. D.C.), is not here applicable, even if it be assumed (a matter we need not decide) that we would follow that lower court decision upon precisely similar facts.   Cf. *United States* v. *Winter,* 348 F. 2d 204, 210–211 (2d Cir.), cert. den. 382 U. S. 955.

(c) The judge was not required to rule that, if only one credible witness testified in direct conflict with Giles, the latter could not be convicted without strong corroborative evidence.   The so called "two witness" rule has no applicability.   A number of witnesses testified about relevant circumstances, and there was documentary material, all bearing upon the truth of what Giles said.   See Perkins, Criminal Law, 393.   See also *Commonwealth* v. *Gale,* 317 Mass. 274, 277–278; *Commonwealth* v. *Fine,* 321 Mass. 299, 302–303.

(d) Giles was not prejudiced by the refusal to transfer this trial before a judge, sitting without a jury, to Essex County where related indictments were pending.   See

---

[14] A majority of the court find nothing in this record to suggest that the commission would, in January, 1964, have asked Giles to testify at all if it had not been for his own request to the Attorney General for an opportunity to appear, or that the commission had any purpose in January, 1964, except to comply with his request.   The majority do not regard as relevant to the issues in this appeal the transcripts of the testimony in the Essex County pre-trial proceedings concerning indictments against Giles and others in that county. This opinion does not attempt to deal with the issues in those proceedings. These transcripts were submitted to us by Giles' counsel, without any request therefor, when he transmitted to us, through the clerk, material (now no longer of importance) furnished to him pursuant to a pre-trial order in this case but omitted from the original record.   See G. L. c. 278, § 33 (as amended through St. 1933, c. 265), and c. 231, § 135 (as amended through St. 1960, c. 171).

*Crocker* v. *Superior Court,* 208 Mass. 162, 180.   See also *Commonwealth* v. *Bonomi,* 335 Mass. 327, 333.

(e)  Other assignments now require no comment.

4.  On the first count, the judgment is reversed and the finding of guilty is set aside.   Judgment for the defendant on the first count is to be entered.   On the second count, the judgment is reversed and the finding of guilty is set aside.

*So ordered.*

KIRK, J. (dissenting)   Mr. Justice Spiegel and I reaffirm the view expressed in our dissent in the first *Giles* case (350 Mass. 102, 113) that the indictment brought under the second clause of the first sentence of G. L. c. 268, § 1, is without foundation in law.   As aptly stated by Shaw, C.J., in *Commonwealth* v. *Willard,* 22 Pick. 476, 477–478, ''No precedent and no authority has been shown for such a prosecution, and no such prosecution has been attempted within the knowledge of the Court, although a similar law has been in force almost from the foundation of the government . . . .   That such a prosecution is unprecedented, shows very strongly what has been understood to be the law upon this subject.''

On the present appeal, our positions are, in summary: (a) We agree with the majority that judgment should be entered for Giles on count 1, but we are not in accord with the majority's reasoning in reaching the result.   (b) We agree with the majority that a person accused of perjury is entitled before trial to a complete copy of his testimony on which the accusation is based, but we believe that the statement by the majority does not go far enough.   (c) We agree with the majority that the judgment on count 2 should be reversed, but we believe that justice requires that judgment be entered for Giles on count 2.   (d) We believe that there are errors which permeate the indictment as a whole and require that judgment be entered for Giles on both counts.

1.   Because it is quite unlikely that the circumstances attending this case will again come to pass, we think it would

be fruitless to discuss our reasons for entering judgment on count 1 for Giles.

2.   The majority have declared that in perjury cases, "hereafter, the defendant *ordinarily* should be furnished in advance of trial a copy of what he himself has said *in the testimony alleged to have been false,* without the necessity of his showing any 'particularized need.' See *Pittsburgh Plate Glass Co.* v. *United States,* 360 U. S. 395, 400" (emphasis supplied).   Our position is that a person charged with perjury, whether it be before a grand jury or crime commission or other body, is entitled *as of right to a complete transcript of his own testimony* before the tribunal where the perjury allegedly occurred, sufficiently in advance of trial to enable him to prepare his defence.   This is the Federal rule.   *Dennis* v. *United States,* 384 U. S. 855. *United States* v. *Remington,* 191 F. 2d 246 (2d Cir.). *United States* v. *Rose,* 215 F. 2d 617 (3d Cir.).   *United States* v. *White,* 104 F. Supp. 120 (D. N.J.).   It represents the current weight of judicial authority among those States where the subject is not explicitly covered by statute.   *Minton* v. *State,* 113 So. 2d 361 (Fla.).   See *Gordon* v. *State,* 104 So. 2d 524 (Fla.); *State* v. *Moffa,* 36 N. J. 219.; *State* v. *Clement,* 40 N. J. 139; *People* v. *Kresel,* 142 Misc. (N. Y.) 88; *People* v. *Golly,* 43 Misc. 2d (N. Y.) 122.   For State statutory provisions, see Am. Law Inst. Code of Criminal Procedure, § 150, and commentary, pp. 436–437 (Tent. draft No. 1, 1928).   The issue has not been presented or passed upon in our prior decisions.   Now that it is squarely presented, we think elementary considerations of justice require that the prevailing rule be adopted without reservation or qualification.

3.   Although the majority have reversed the judgment on count 2 of the indictment, they have not ordered judgment for the defendant on the count.   Giles is subject to retrial. We are of opinion that there was error (assignment 76) in the denial of Giles' request that the offence charged had not been proved, and that he is entitled to judgment on count 2.   In addition, because Giles is now subject to re-

trial, we are compelled to examine in detail the reasoning of the majority which we believe is unsound and would be detrimental to Giles on a retrial.

a. The offence charged was that Giles, in response to the question "whether . . . [he] had ever received any amounts of *money* from Nessex . . .," wilfully and corruptly testified "that he had never received a salary or commission or *money* from Nessex for any other purpose other than a loan" (emphasis supplied). The trial judge quite rightly granted Giles' requested ruling (12) that the question "must be narrowly construed to mean that Nessex Engineering must have turned over its *moneys* to Mr. Giles" (emphasis added). The majority do not dispute the appropriateness of the ruling. The ruling means that Giles could not be found guilty on count 2 unless there was proof beyond a reasonable doubt that he had, in fact, received money from Nessex.

An examination of the judge's ruling giving request no. 33 shows unequivocally that he found that Giles had not received any money from Nessex. The judge ruled that "[o]n the evidence of this case . . . Giles while testifying under oath would have perjured himself had he stated that he *had* received moneys from Nessex Engineering" (emphasis added). The judge's ruling (request no. 33) is irreconcilable with his finding of guilt. The two are mutually exclusive and cannot stand together. When the judge's finding of guilt is tested by his ruling (request no. 33), the finding of guilt is plainly wrong. The ruling shows that the Commonwealth has failed to prove beyond a reasonable doubt a necessary element of the crime charged. Giles is therefore entitled to judgment. He should not again be subject to trial for the same alleged crime.

b. Having shown that the judge's rulings require a finding of not guilty, and, consequently, the entry of judgment for Giles on count 2, we turn to examine the reasoning by which the majority conclude that judgment should not be entered for Giles.

(i) The first conclusion which the majority reach is that

Giles' answer to the question in count 2 is not so ambiguous as to preclude a conviction. The meaning which the majority give to the word "money" in Giles' answer, however, requires that judgment be entered for Giles on count 2 for the same reasons that led the majority to enter judgment for Giles on count 1. In place of the word "money" in the indictment, the majority have substituted such phrases as "indirect payments *or* benefits" and "payments of moneys which . . . very directly went to Giles *or* for his benefit" (emphasis supplied). The majority's use of the disjunctive "or" means that in their view proof that Giles received only "benefits" from Nessex is sufficient to establish his guilt under the count. Apart from the fact that the word "benefits" is, by itself, vague, imprecise and ambiguous, it becomes more ambiguous when inserted in Giles' answer in count 2 and read in the context of his testimony, and will not support a conviction.

More important than the fact that the word "benefits" in context is too ambiguous to support a conviction is the fact that the indictment does not charge Giles with wilfully and corruptly testifying that he did not receive "benefits" from Nessex. In criminal law where certainty in pleading is a requirement (*Commonwealth* v. *Dowe,* 315 Mass. 217, 220) the word "benefits" cannot be deemed the equivalent of "money." That the majority intend the word "benefits" to mean something other than money is evident from the fact that they do not rely upon the word "money" to prove the offence charged in the indictment. Indeed, the majority seem to concede that the evidence would not support a finding that Giles had, in fact, received *money* from Nessex. Neither this court nor the Superior Court can trifle with an indictment as returned by the grand jury and substitute for or add to the word "money" the word "benefits" unless there has been compliance with G. L. c. 277, § 35A. *Commonwealth* v. *Snow,* 269 Mass. 598. *Commonwealth* v. *Bracy,* 313 Mass. 121, 126.

By predicating Giles' guilt upon the term "benefits" the majority have created a situation where the offence has

neither been proved as charged nor charged as proved. "It is elementary in the criminal law of this Commonwealth that '[t]he offence must not only be proved as charged, but it must be charged as proved.' *Commonwealth* v. *Blood,* 4 Gray, 31, 33. *Commonwealth* v. *Phelps,* 11 Gray, 72. *Commonwealth* v. *Dean,* 109 Mass. 349, 352. *Commonwealth* v. *Wentworth,* 146 Mass. 36, 38. *Commonwealth* v. *King,* 202 Mass. 379, 389. *Commonwealth* v. *Coyne,* 207 Mass. 21, 23–24. *Commonwealth* v. *LaPointe,* 228 Mass. 266, 268. *Commonwealth* v. *Albert,* 307 Mass. 239, 244." *Commonwealth* v. *Ancillo,* 350 Mass. 427, 430.

(ii) In determining that judgment should not be entered for Giles on count 2, the majority purport to test the judge's finding of guilt by his actions on requested rulings, and they conclude that they are "sufficiently uncertain how the judge instructed himself on the second count to cause . . . [them] to reverse the judgment on that count" but not to enter judgment for Giles. What leads the majority to deny judgment for Giles is that they do not in fact test the judge's finding of guilt by his rulings but, rather, conclude that they are unable to do so. Examining those requests (13, 15, 16) which the judge denied (see majority opinion, footnote 13), the majority state that the judge's refusal to give them "suggest[s] that the judge interpreted Giles' answer . . . as denying that he had been the beneficiary of direct or indirect payments from Nessex." Based upon this statement the majority make the assertion that they "cannot reconcile" the denial of these requests with the judge's granting of request no. 33. The inference left to be drawn by the reader is that it is therefore impossible to decide against which of the requested rulings — those granted or those denied — the judge's finding of guilt should be tested.

The purported irreconcilability of the rulings follows from a fault in the majority's reasoning, and the fault is of their own creation. The fault consists in their failure to recognize that the meaning to be given to Giles' answer is a question separate and distinct from the question

whether the answer was false. For, even if the meaning of Giles' answer which the majority impute to the judge from his refusal to give requested rulings 13, 15 and 16 be adopted, it does not lead to the conclusion, which the majority reach, that his finding of guilt cannot be tested by his rulings. The requests which the judge denied were directed toward the *meaning* to be given to Giles' answer. The request (33) which he granted was directed to whether the answer was *false*. Because the requests were addressed to different issues there is no basis for concluding that the disposition of them was irreconcilable. Although the judge's denial of requests 13, 15 and 16 may "suggest" that the judge found that Giles, in his answer, denied both direct and indirect payments of money from Nessex, the granting of request no. 33 imports that, upon all the evidence before him, the judge found that Giles did not receive any money, directly or otherwise, from Nessex and that hence the answer was truthful. Because the majority are unable satisfactorily to resolve the inconsistency between the ruling (request 33) given and the finding of guilt, judgment should be entered consistent with the ruling given.

The majority seek to justify the withholding of judgment from Giles by attacking the judge's ruling (request 33) on three grounds. First, the majority state that " [i]t is possible that the judge interpreted request no. 33 as referring merely to *direct* payments from Nessex to Giles" (emphasis supplied). The implication is that such an interpretation of request no. 33 would remove the inconsistency they find between the requests denied and the requests granted. We have already shown that no such inconsistency exists. The narrow interpretation of request no. 33 by the majority would remove the inconsistency which exists between the ruling given (request no. 33) and the judge's finding of guilt. But it is clear from the judge's denial of requests nos. 13, 15 and 16 that he did not intend his ruling (request no. 33) to refer merely to *direct* payments. It is the majority who say that the denial of requests 13, 15 and 16 "suggests" that the judge interpreted Giles' answer in the in-

dictment as a denial of both direct and indirect payments of money or benefits. It is the majority who have gone to such great length to give breadth and scope to Giles' answer in count 2. We consider it ironic that they should now suggest that the same legal proposition, conversely stated, should be so strictly construed as to encompass only direct payments from Nessex to Giles.

The majority also imply that the granting of request 33 was the result of Giles' "unduly large number" of requests which "had a tendency to become 'a device to ensnare . . . [the judge] into error.' Stella v. Curtis, 348 Mass. 458, 460–461." Majority opinion, footnote 12. Nowhere does it appear that the judge considered the number of requests excessive. If he did, relief was open to him. See majority opinion, footnote 12. In addition, the reference to the Stella case scarcely seems apposite. The Stella case was a personal injury case where a plethora of requests was made on the sole issue of damages. Here, in contrast, we have a criminal case without precedent in law. It was imperative that the processes of legal thinking employed by the judge be ascertained in order to guard the defendant's rights.

Finally, the majority attack request 33 on the ground that "Giles had not so testified and there was no occasion for giving the ruling."[1] The statement is misleading. The purpose of request 33 was to test the judge's thinking on all of the evidence introduced at trial, not merely his thinking on what took place at the commission hearing. One of the issues in the case was whether Giles had received money from Nessex. The request asked the judge to rule on the sufficiency of the evidence on that issue. The ruling was decisive of the issue. It is an accepted rule of practice that such a request is a proper one and must be passed upon by the judge. Stella v. Curtis, 348 Mass. 458, 461. Bresnick v. Heath, 292 Mass. 293, 298–299. Judgment should be entered consistent with the ruling given.

---

[1] Compare footnote 9 of the majority opinion wherein the majority make use of another ruling given by the judge concerning a matter about which "Giles had not so testified . . . ."

(iii) The majority conclude from their examination of all the evidence that the judge *could* have found Giles guilty of perjury. The test in a prosecution for perjury is whether the defendant's answer as alleged in the indictment, at the moment it was given, was wilfully and intentionally false. In our view, the majority's discussion of count 2 falls far short of establishing the coincidence of these several facts. In addition, our examination convinces us that, on any view of the record, the essential coincidence of these several facts cannot be established. The judge's finding of guilt is neither supported by the evidence, nor consistent with his rulings. The proper action in such a case is not to subject the defendant to a retrial in order to give the prosecution another chance to convict, but to enter the judgment for the defendant to which he is now entitled.

4. In addition to what we have said, there are errors which permeate the indictment as a whole and require that judgment be entered for Giles on both counts. In particular, the majority disregard the basic concept that a conviction of perjury cannot stand unless proof is forthcoming that the answer of the witness, if proved false, is material, i.e., has a reasonable and natural tendency to influence or affect the result of or decision on the *matter under investigation*. In the first *Giles* case, 350 Mass. 102, 110, the majority acknowledged the validity of this concept. It is the settled law of the Commonwealth that it is an essential element of the offence. *Commonwealth* v. *Louis Constr. Co. Inc.* 343 Mass. 600, 607. It is equally well settled that the proof must be beyond a reasonable doubt. *Commonwealth* v. *Pollard,* 12 Met. 225, 228–229. *Commonwealth* v. *Grant,* 116 Mass. 17, 20–21. *Commonwealth* v. *Aronson,* 250 Mass. 521.

With respect to the issue of materiality, the majority say that "the *inquiries* made were *relevant* to the commission's general legislative investigation" (emphasis supplied). This, however, is not the test. It is the materiality of the *defendant's answer* which, if proved false, is crucial in a prosecution for perjury. See the first *Giles* case,

350 Mass. 102, 110.   The majority state that there is *"noth-ing in this record to suggest that the commission would, in January, 1964, have asked Giles to testify at all* if it had not been for his own request to the Attorney General for an opportunity to appear, *or that the commission had any purpose in January, 1964,* except to comply with his request"[2] (emphasis supplied).   Majority opinion, footnote 14.   The italicized language is a clear acknowledgment by the majority that Giles' answers could have no reasonable or natural tendency to influence the result of or decision on the matter under investigation, and therefore cannot be deemed material.   This conclusion follows no matter who requested the hearing.   The prosecution's failure to prove an essential element of the offence entitled Giles to judgment on both counts.

We observe that the majority's treatment of materiality here is reminiscent of their treatment of materiality in the first *Giles* case, 350 Mass. at 112.   The indictment did not allege that Giles' allegedly false answers were material to the matter under investigation.   The majority said, however, contrary to our earlier decisions, that materiality need not be *alleged,* because it was implied in the indictment.   And now the majority, despite their admissions that the commission would not have asked Giles to testify at all and that the commission had no purpose for getting his testimony, nevertheless refused to enter judgment for Giles on count 2.   They thereby imply, but do not say, that the materiality of his testimony need not be *proved.*   This is a departure from the law of perjury as it has always been understood here and elsewhere.

We are prepared to show from all that is before us that not only has the prosecution failed to prove the materiality of Giles' answers, but also that they are unable to do so upon any retrial.   By "all that is before us," we include not only all that was in the record when the case was argued before this court, but also two documents which, four

---

[2] The portions of the majority's statement which relate to the proposition that the hearing was held solely to accommodate Giles are discussed below.

months after argument, were made available to the court.
See majority opinion, footnote 14. We refer particularly
to a photostat of the undisputed testimony of Mr. Alfred
Gardner, chairman of the Crime Commission, before a judge
of the Superior Court sitting at Newburyport, on June 25,
1964. The judge was the same judge who presided at the
trial under review. Counsel for the commission and for
Giles were the same counsel as in the case under review.
The testimony concerned "related indictments" against
Giles and others then pending in Essex County. The "re-
lated indictments" are incorporated by reference in the
record of the case before us and are referred to in the last
page of the majority opinion.

The sequence of events disclosed by a reading of all that
is before us shows Nessex and Stuart had been under in-
vestigation since early in 1963. According to Mr. Gardner,
in 1963 on October 2, and October 16, and on November 9,
respectively, the Crime Commission voted to submit to the
Attorney General its evidence relating to Nessex, Stuart,
Giles, and others. A statement was prepared by the com-
mission's counsel, and the evidence, with the statement,
was turned over to the Attorney General. Thus, as early
as October 2, 1963, and certainly no later than November 9.
1963, the Crime Commission and its counsel were convinced
that they were in possession of sufficient evidence to prose-
cute Giles on the Nessex and Stuart matters. Although no
action was taken by the Attorney General in response to the
Crime Commission's communications, the commission's de-
cision on the matter under investigation had been made.
Giles' answers, subsequently given at the commission hear-
ing, could have no reasonable or natural tendency to in-
fluence a decision which already had been made and there-
fore cannot be deemed material.

The majority state that the only reason the commission
held the hearing of February 4, 1964, was "to comply with
. . . [Giles'] request" for a hearing, and that Giles would
not have been asked to testify at all "if it had not been for
his own request to the Attorney General for an opportunity

to appear.'' Majority opinion, footnote 14. We find, how-
ever, that a comparison of the dates when the commission
submitted its evidence to the Attorney General for action
with the dates and content of the commission's correspon-
dence is strikingly revealing, particularly when read in light
of the fact that the commission had reached its decision and
therefore had no need for Giles' testimony regarding the
matter under investigation, a fact which the majority con-
cede (majority opinion, footnote 14). It reveals that the
true purpose of the commission's inquiry of Giles was not,
as the majority state, to accommodate Giles but, rather,
was to elicit from him testimony which the commission
could measure against other detailed information already
gathered by its investigators and then, if a discrepancy
could be found, to prosecute Giles for perjury. On Octo-
ber 11, 1963, nine days after the Attorney General had first
been requested to take action, and none had been forthcom-
ing, the commission's counsel wrote to Giles, giving him an
''opportunity to appear voluntarily at a hearing.''[3] On
October 15, 1963, the day before the Attorney General was
requested for the second time to take action, the commis-
sion's counsel wrote to Giles' counsel stressing that the
earlier letter to Giles was an ''invitation'' and not a re-
quest, but giving no indication that Giles was under investi-
gation.[4] On January 31, 1964, several weeks after the

---

[3] The commission counsel's letter read in part: ''An investigation being
conducted by us at the Department of Public Works caused us to make inquiry
concerning Nessex Engineering Corporation, Stuart Engineering Services, Inc.
and . . . [one named individual, not Giles]. We desire to give you the oppor-
tunity to appear voluntarily at a hearing, if you desire, to discuss Nessex,
Stuart and . . . [the one named individual, not Giles].''

[4] The text of the letter, sent to Giles' attorney by counsel for the commis-
sion, is as follows: ''In order to eliminate any misunderstanding of the posi-
tion of the Commission with respect to the appearance of Mr. Giles before it,
I want to make clear to you as his counsel that the letter I wrote him on
October 11, 1963 was an invitation to appear and give testimony, if he elected
to do so, and was not a request. The Commission wanted him to know that
the Nessex Engineering Corporation, Stuart Engineering Services, Inc. and
. . . [one named individual, not Giles] are being investigated and wanted him
to have an opportunity to give it any evidence that he might wish to have
made a matter of record. Since you have said that he is unwilling to appear
and give evidence under oath without a summons and since the Commission is
not requesting his testimony and therefore will not issue a summons to him,
the Commission considers that the question of his appearance before it is
closed.''

Crime Commission's evidence had been submitted to the Attorney General and no action had been taken, the commission chairman sent a letter to the Attorney General, a copy of which was forwarded to Giles, renewing the "invitation" for Giles to appear before the commission upon the commission's own terms. The commission chairman's letter stated that the purpose of the hearing was to give Giles "an opportunity to explain to the Crime Commission his activities with respect to the survey companies that the Commission has investigated." As a result of this letter, and contrary to the advice of counsel, Giles appeared before the commission on February 5, 1964, with counsel.[5]

At no time prior to his appearance before the commission was Giles given any indication of the extent of the commission's prior investigation or that the commission on three occasions had requested the Attorney General to take action against him. When Giles did appear before the commission, the opening statements of the chairman and the commission's counsel gave him no inkling that he was under investigation. Mr. Gardner advised Giles of his constitutional rights and administered the oath. Before the interrogation began, the commission's counsel said: "As you know, since sometime last fall, we have been conducting an investigation of the Nessex Engineering Company, Stuart Engineering Associates . . . [and two named individuals, not including Giles] . . ., and I wondered with reference to either the investigation in general or the subject matter of the investigation as pertains to those two corporations and the two individuals if you desired to make for the benefit of the Commission some statements?" The fair import of both the commission correspondence and counsel's statement at the opening of the hearing is that the commission was interested only in the conduct of the two named corporations and the two named individuals (not including Giles), and that Giles' own conduct was not under investigation.

---

[5] It should be noted that under the Crime Commission's practice the role of a witness' counsel is limited to consultation with the witness. He has no right to examine the witness or to object to questions or, unless invited, to make a statement.

Commonwealth *v.* Giles.

On February 29, 1964, three weeks after Giles appeared before the commission, the Attorney General asked for a special grand jury in Essex County. On March 16, 1964, the Essex County grand jury convened, and on March 25, 1964, returned four indictments, encompassing fourteen counts, against Giles relating to matters concerning Nessex and Stuart. The last phrase in the last sentence of the last count of the last numbered indictment alleges that Giles "while testifying under oath before the Massachusetts Crime Commission . . . [affirmed] falsely in a matter material to the issue . . . stating in substance that he had no personal or financial connection . . . with Nessex . . . ." The close identity of this language with that used in count 1 of the indictment now before us is obvious. Five weeks after the indictments were presented in Essex County, the indictment now before us was returned by a special grand jury then sitting in Suffolk County to hear matters prepared by the Crime Commission. The Essex indictments have never been brought to trial.

The course of events, controlled by the Crime Commission before, at and after the hearing, makes it painfully clear that the commission's purpose was neither to give Giles "an opportunity to explain" nor to gain additional information from him. Instead, the commission's real purpose was to disarm Giles by letter and by the opening statements of the chairman and the commission counsel, and then to adopt a method of inquiry which would lead Giles to make a general statement which could be found to be inconsistent with the mass of detailed evidence already submitted to the Attorney General by the commission and thus, by the additional allegation that Giles had committed perjury, spur the Attorney General to action. In short, what we have here is an indictment contrived by the Crime Commission for alleged perjury before the Crime Commission on a matter concerning which its investigation had been closed and its decision to prosecute had been made several months prior to Giles' testimony.

An explanation of, although by no means a justification for, the Crime Commission's extraordinary procedure may be found in the Third Report by the commission dated December 2, 1963 (prior to the "invitation" to Giles of January 31, 1964), which stated in substance that its legislative recommendations would not carry weight until there were convictions. The commission's statement also explains its decision to indict and prosecute Giles for perjury in Suffolk County rather than prosecute the conflict of interest indictments obtained earlier in Essex County. Although the "matter under investigation" by the commission was conflict of interest, there were and are serious impediments, including the statute of limitations, to the successful prosecution of those indictments. See Massachusetts Crime Commission, Fifth Report (1965) p. 8. Under the guise of a perjury indictment, however, the prosecution would be able to reach back, as it did reach back, to 1954 and introduce in evidence such matters as are referred to in footnotes 5, 6 and 7 of the majority opinion, in an effort to show that Giles' answers to the two alleged questions by the commission in 1964 constituted perjury.

Law enforcement in this Commonwealth, as we long have known it, has sprung from a purpose to detect crime, to apprehend the criminal, and to bring him to justice for his misdeeds rather than from a desire to ensnare and victimize a citizen and bring him to his ruin by the misuse of his words. Our position is that an indictment procured as this one was procured is such a reproach to public justice as to cause this court to reject any conviction based upon it. We do not rely upon *United States* v. *Icardi,* 140 F. Supp. 383 (D. D.C.) nor do we ask that the Federal rule against entrapment be invoked. The facts speak for themselves. The indictment is anomalous. The counts are sophistical. The proof is synthetic. Both convictions are wrong.